36 A.3d 24

COMMONWEALTH of Pennsylvania, Appellee

v.

Abraham SANCHEZ, Jr., Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 15, 2010.

Decided Dec. 21, 2011.

4

12

14

Robert J. Kirwan II, Cirba & Kirwan, P.C., Reading, for Abraham Sanchez Jr.

Craig William Stedman, Lancaster, Christopher Peter Larsen, Lancaster County District Attorney's Office, Amy Zapp, PA Office of Attorney General, Harrisburg, Todd P. Kriner, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

We review the direct appeal of Abraham Sanchez, Jr. ("appellant") from the sentence of death imposed on March 30, 2009, following a trial by jury before the Honorable Joseph C. Madenspacher of the Lancaster County Court of Common Pleas. Appellant raises eight claims of trial court error regarding aspects of the guilt and penalty phases of his trial, including a challenge to the timing and the use of the jury in adjudicating his claim of death penalty ineligibility under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In *Atkins*, the U.S. Supreme Court held that execution of the mentally retarded violates the constitutional prohibition against cruel and unusual punishment. For the reasons that follow, we affirm the conviction and judgment of sentence. In addition, we take this opportunity to devise a procedure for implementing the *Atkins* decision in Pennsylvania. *See* Section VII, *infra*.

### Case History

On May 2, 2007, appellant and his friends Lorenzo Schrijver, Robert Baker, and Emru Kebede met at the home of Susan Bass, Baker's then-fiancee, to plan a robbery. The four men gathered almost daily in the basement of the Mount Joy, Pennsylvania, home, where Bass shared a room with Baker; appellant and Schrijver were closest to each other. Schrijver, a citizen of the Netherlands and recent arrival in the United States, was dating and later became engaged to appellant's sister, Enid Orona. Appellant, Schrijver, Orona, and Orona's son lived together. Appellant and Schrijver had met Baker two months earlier, at a Burger King that Orona managed and where Schrijver's grandmother worked; Baker and Kebede had been friends for a few years.

Appellant and Schrijver discussed the robbery as a means to finance their burgeoning marijuana sale operation. When Bass returned home from work on May 2, 2007, she found appellant and Schrijver cleaning and "playing" with a gun that the two had left with Baker a few weeks earlier. Appellant

had persuaded Schrijver in early April 2007 to purchase the handgun—a .22 caliber Smith & Wesson black revolver—from one of appellant's acquaintances. After one of their marijuana buyers was arrested, appellant and Schrijver had asked Baker to store the gun and some drugs. Baker kept the gun in a shoe box under Bass's bed. At the beginning of May 2007, appellant and Schrijver removed the gun from Bass's house because they learned Baker had been using it to shoot trees and street signs. Appellant and Schrijver stored the gun under the passenger seat of Schrijver's car, a green Geo Metro hatchback.

The night of May 2, 2007, after deciding to go through with the robbery, appellant and Schrijver asked Baker and Kebede to join them. Eventually, the four men agreed to either burglarize a home or break into a car. All obtained gloves. At the time, appellant was dressed in long black jeans and a red short-sleeve shirt with a gray logo on the front. Schrijver was wearing a white T-shirt and blue jeans, and Baker was dressed in all-black. Appellant and his companions left Bass's house in Schrijver's Geo Metro and drove towards Elizabeth-town.

After driving for a while, Schrijver noticed an isolated house with a light on and an elderly man, Ray Diener (the "victim"), sitting at a table inside. Schrijver parked the car and the four men walked up to the victim's house; Schrijver rang the door bell. The victim turned on the porch light and came to the door. Appellant, Baker, and Kebede remained hidden in the shadows on the right and left of the door. Schrijver asked to use the phone, telling the victim that his car had broken down. While the victim returned to the house to bring his cell phone, Schrijver handed the gun to appellant and prepared to attack the victim.

The victim returned, and Schrijver testified that he took the phone and pretended to make a call because he was uncertain how to proceed. At that point, appellant came out of the shadows, pointed the gun at Mr. Diener and told him to lie down. The victim grabbed the gun and screamed "No, no, no." The victim and appellant wrestled over the gun. Appel-

lant discharged the gun, and the bullet hit the victim in the groin area and fractured his hip. The victim fell down, and began crying and pleading for help. After the shot, Baker and Kebede fled towards Schrijver's Geo Metro. Schrijver stayed and told appellant to shoot the victim again. Appellant put the gun in the victim's mouth and threatened him to keep quiet but the victim continued crying. Appellant backed up and shot the victim in the chest.

The victim was still alive when his wife, Barbara Diener, who was awakened by her husband's screams, came outside. Mrs. Diener saw her husband on the ground and heard Schrijver say "There's the wife." She ran back inside, locked the doors, and called 911. Mrs. Diener told the 911 operator that two men were trying to open the door. Then, appellant, who was standing over the victim, shot the victim again, through the neck and shoulder. Schrijver fled towards his car, quickly followed by appellant, and the four men drove away. Mrs. Diener went back outside, covered her husband's body, and sat with him until the police arrived.

Appellant and his companions drove towards Elizabethtown. Appellant wiped down the gun and threw the spent shell casings out of the car window, one by one. Schrijver asked appellant how he felt about shooting a man, and appellant answered that he felt like a "G"—a gangster. N.T., 3/3/2009, at 1641. According to Schrijver, appellant looked "excited" and showed no remorse. Schrijver gave appellant Mr. Diener's cell phone and suggested calling 911. At the suggestion of the other men, however, appellant turned off the cell phone. Then, appellant and his companions went to pick up Orona's son from the home of Schrijver's grandmother. From there, the men drove to an abandoned house where appellant and Schrijver normally hid drugs, and appellant got out and hid the gun under a concrete block on the floor of the abandoned house. Schrijver dropped off Baker and Kebede at Baker's house, and went with appellant to pick up Orona from work. Outside the Burger King, Schrijver asked appellant again about how it felt to shoot somebody. Appellant "shrugged it off," and told Schrijver that, at the third shot, he saw the

victim's "hair fly up and the eyes rolling back in the head." N.T., 3/3/2009, at 1649. According to Schrijver, appellant was acting "tough" and bragging about his actions.

Barbara Diener called 911 at approximately 10:45 p.m., and police officers were dispatched to her home in West Donegal Township, on the outskirts of Elizabethtown. Officers Shuey and Cleland arrived at the scene and found Mrs. Diener on her porch, kneeling and holding the victim's body. Officer Shuey took Mrs. Diener inside and surveyed the property for the possible presence of perpetrators. Meanwhile, Officer Cleland approached the victim who was lying face-down in the flower bed, with the lower half of his body on the porch steps. Cleland concluded that the victim was dead and noted that blood was coming from wounds caused by a small caliber weapon to the victim's chest and thigh. Dr. Newman, a local assistant coroner and neighbor of the victim, arrived at the scene and confirmed Officer Cleland's observations. Subsequently, other emergency personnel and police arrived to begin the investigation, and secure and process the scene.

The main investigator, Police Officer Wahl, interviewed Mrs. Diener, who stated that, when she came outside to the porch, she was confused and her focus was on her injured husband. Mrs. Diener said that she briefly heard a man addressing another person, from which she concluded that there were two perpetrators. She described them as male, 5'8" or 5'9" in height. According to Mrs. Diener, "they were white because they weren't black. I don't know if they were Mexican or [H]ispanic or Spanish." Mrs. Diener also stated that one of the perpetrators may have been wearing a red T-shirt and khakis, but she was unable to describe his facial features. A sketch artist drew a composite from Mrs. Diener's description of a second perpetrator.

Following the murder, appellant spoke to several persons about the night of May 2, 2007. On May 4, while he was riding in Schrijver's Geo Metro, appellant opened the glove box and showed the other passengers the victim's cell phone, saying it was "[his] new cell phone." According to Bass, who was in the car, appellant boasted that he shot the victim "for

fun" in the foot, stomach, and head. Around the same time, appellant also confessed to his friend Marcus Pendleton while the two played videogames. Appellant told Pendleton that he and his friends robbed and shot the victim, taking his cell phone. Finally, appellant described the night of the murder to his Burger King co-worker, Chad Forry, and admitted to shooting the victim three times. According to Forry, appellant said that he was trying "to shut the nigga up." N.T., 3/5/09, at 2129. Forry described appellant as smiling when he told the story. Bass, Pendleton, and Forry gave the police written statements after appellant and his companions were arrested.

The police arrested appellant, Schrijver, Baker, and Kebede on May 22, 2007. Appellant, Schrijver, and Baker gave the police statements regarding the events of May 2, 2007, and minimized their involvement in the victim's murder. Both Schrijver and Baker identified appellant as the victim's killer. Subsequently, both men provided other statements to the police, again identifying appellant as the shooter. Further investigation by the police also led to the recovery of the murder weapon and ammunition, two pairs of gloves, and the victim's cell phone. No usable fingerprints or DNA were found on the weapon or the plastic bag in which the weapon was wrapped. One pair of gloves revealed Schrijver's DNA; both sets of gloves tested negative for gunpowder residue and blood.

On August 3, 2007, appellant was charged with one count each of criminal homicide, 18 Pa.C.S. § 2501(a); robbery, 18 Pa.C.S. § 3701(a)(1)(i); and criminal conspiracy to commit robbery, 18 Pa.C.S. § 903(a). Appellant was tried before a jury and found guilty of murder in the first degree, robbery, and criminal conspiracy. On March 11, 2009, the jury sentenced appellant to death. The jury found one aggravator, 42 Pa.C.S. § 9711(d)(6) (appellant committed killing while in the perpetration of a felony, i.e., robbery), and no mitigators. The trial court also sentenced appellant to ten to twenty years for robbery, and a consecutive term of ten to twenty years for criminal conspiracy. Appellant filed a direct appeal to this

Court on October 2, 2009. The trial court ordered appellant to file a Rule 1925(b) concise statement of matters complained of on appeal, and appellant complied. *See* Pa.RAP.1925(b). On December 1, 2009, the trial court issued its Rule 1925(a) opinion.

On appeal, appellant raises the following issues: [1]

1. Whether the evidence presented by the Commonwealth was insufficient as a matter of law to establish [appellant]'s guilt beyond a reasonable doubt on Count 1—Murder of the First–Degree, thereby warranting a Judgment of Acquittal and/or vacat[ur of] [appellant]'s conviction on said count.

2. Whether the evidence presented by the Commonwealth in [its] case in chief was insufficient as a matter of law to establish [appellant]'s guilt beyond a reasonable doubt and/or was the verdict against the weight of the evidence, due to the fact that the only evidence presented to establish [appellant]'s guilt beyond a reasonable doubt came from the Commonwealth's key witnesses, [c]o-defendants, Robert Baker and Lorenzo Schrijver who were admitted liars, guilty of numerous false reports to the investigating officers, extremely biased, contradictory, inconsistent, and highly motivated to lie or fabricate false statements to gain favor with the Commonwealth and were patently unreliable, to such an extent, [that] the Court is compelled to grant a judgment of acquittal and/or a new trial.

3. Whether the evidence presented by the Commonwealth was insufficient as a matter of law to establish [appellant]'s guilt beyond a reasonable doubt on Count 2—Robbery, thereby warranting a Judgment of Acquittal and/or vacat[ur of] [appellant]'s conviction on said count and further warranting the vacat[ur] of the sentence of death due to the lack of any aggravating factors to justify the imposition of the death sentence by the jury.

4. Whether the [t]rial [c]ourt committed reversible error in denying [appellant]'s *"Batson* [2] challenge" to the Common-

1. The issues on appeal have been reordered for clarity.

2. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

wealth's intentional striking of prospective juror # 34, a black female who was otherwise a "death penalty qualified juror."

5. Whether [appellant] was denied a fair trial due to the repeated emotional outbursts by the victim's family during critical parts of the trial causing significant jury distraction and significant prejudice to [appellant] and whether the [t]rial [c]ourt committed error by refusing to remove the disruptive family members after an objection was made to their continued presence in the courtroom without a reprimand or warning from the court to cease any further outbursts.

6. Whether the [t]rial [c]ourt committed reversible error by allowing the jury to review graphic photographs depicting the victim lying dead under a sheet with body parts sticking out from under the sheet and/or displaying the victim's blood stained clothing, all of which had no evidentiary value but an extreme prejudicial effect on the jury.

7. Whether the [t]rial [c]ourt committed reversible error by refusing to conduct an evidentiary hearing and issue a ruling on [appellant]'s eligibility to face the death penalty due to his mental retardation, as set forth in the standards and rulings of *"Atkins v. Virginia"* [3] and Pennsylvania case law *prior* to the commencement of the jury selection and trial and further compounded the reversible error by refusing to make a judicial determination regarding [appellant]'s mental retardation and allowing the jury to make a post-verdict determination of whether [appellant] was mentally retarded and therefore not eligible for the [d]eath [p]enalty.

8. Whether the trial court failed to properly instruct the jury on the applicable standards regarding mental retardation and the subsequent eligibility of [appellant] to receive the [d]eath [p]enalty.

Appellant's Brief at 6–8. Setting aside the argumentative framing of the questions, appellant raises eight distinct issues:

3. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

(1) whether the evidence was sufficient to establish first-degree murder; (2) whether the overall verdict of guilt was against the weight of the evidence; (3) whether the evidence was sufficient to establish robbery; (4) whether the trial court erred in denying appellant's *Batson* challenge to the Commonwealth's peremptory striking of prospective juror # 34; (5) whether the trial court erred by refusing to remove from the courtroom, reprimand, or warn the victim's family members for sobbing during the trial; (6) whether the trial court erred in allowing the jury to review photographs of the victim's body and clothing; (7) whether the trial court erred by refusing to decide appellant's *Atkins* claim prior to jury selection and trial; and (8) whether the trial court failed to instruct the jury properly on the applicable standards of mental retardation. Appellant requests judgment of acquittal on the counts of murder in the first degree and robbery. In the alternative, appellant seeks a new trial or *vacatur* of his death sentence. We address each issue individually. The record will be developed further *infra*, as necessary to resolve the issues on appeal.

## I. Sufficiency of the Evidence: Murder in the First-Degree [4]

Appellant's first claim is that the evidence introduced by the Commonwealth at trial was insufficient to establish his guilt on all charges and with respect to first-degree murder specifically. According to appellant, his sufficiency and weight of the evidence claims are "essentially one in the same." Appellant's Brief at 28. In support of both claims, appellant contends that the testimony of his co-defendants Schrijver and Baker was the sole evidence to place him at the scene of the crime, evidence that was unreliable, contradictory, and an insufficient basis for a verdict. *Id.* at 29 (citing *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976) ("[W]here evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based

---

4. Appellant briefs issues 1 and 2 together. However, we will address these issues separately because they raise distinct questions, as will become apparent from our analysis, *infra.*

thereon pure conjecture, a jury may not be permitted to return such a finding.")). Appellant requests a judgment of acquittal or a new trial. The Commonwealth responds that appellant's sufficiency of the evidence argument is underdeveloped and hinders any meaningful review by the Court. Commonwealth's Brief at 25. According to the Commonwealth, appellant forwards arguments regarding the weight of the evidence, which requires a separate and distinct analysis from a sufficiency claim. Upon review of the record, the trial court concluded that the evidence was sufficient to establish that appellant was guilty of first-degree murder.

On appeal, we agree with the Commonwealth that appellant fails to meaningfully develop his sufficiency claims regarding the first-degree murder and conspiracy convictions.[5] *See Commonwealth v. DeJesus,* 580 Pa. 303, 860 A.2d 102, 105–07 (2004) (challenge to verdict pursuant to *Farquharson* is to weight, not sufficiency, of evidence). But, in all capital direct appeals, this Court reviews the evidence to ensure that it is sufficient to support the first-degree murder conviction, whether or not the appellant raises or develops the issue. *Commonwealth v. Blakeney,* 596 Pa. 510, 946 A.2d 645, 651 n. 3 (2008). We conduct *sua sponte* review of the sufficiency of evidence only as to the capital first-degree murder verdict and not with regard to any related convictions. *Commonwealth v. May,* 584 Pa. 640, 887 A.2d 750, 753 n. 10 (2005).

In performing sufficiency review of a first-degree murder conviction, this Court ascertains whether evidence introduced at trial and all reasonable inferences derived from the evidentiary record, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish beyond a reasonable doubt all elements of the offense. *Id.* at 753. Evidentiary sufficiency is a question of law and, therefore, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Meals,* 590 Pa. 110, 912 A.2d 213, 218 (2006). First-degree murder is an intentional

5. Appellant addresses separately whether the evidence was sufficient to prove robbery. *See* Issue 3, *infra.*

killing, *i.e.,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). The Commonwealth proves a person guilty of first-degree murder by establishing that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and a specific intent to kill. *See* 18 Pa.C.S. §§ 2501(a), 2502(a), (d); *Commonwealth v. Montalvo,* 604 Pa. 386, 986 A.2d 84, 92 (2009); *Commonwealth v. Pagan,* 597 Pa. 69, 950 A.2d 270, 278–79 (2008). Furthermore, the jury, as a factfinder, may infer that the accused intended to kill a victim based on the accused's use of a deadly weapon on a vital part of the victim's body. *May,* 887 A.2d at 753.

At trial, the Commonwealth introduced uncontested forensic evidence and eyewitness testimony that the victim had been shot three times with a small caliber weapon: once in the groin area, once in the chest, and once in the neck/shoulder area. The last two gunshots were fatal and the victim died at the scene. Based on this evidence, the jury properly could conclude that a human being was unlawfully killed, that the killing was with malice, and that the killing was intentional because the deadly weapon was used on vital parts of the victim's body.

With respect to the identity of the murderer, the Commonwealth offered into evidence testimony from co-defendants and eyewitnesses Schrijver and Baker, from Susan Bass and her brother Jeffrey, from appellant's friend Marcus Pendleton, and from appellant's Burger King co-worker Chad Forry. Schrijver and Baker recounted that, on May 2, 2007, together with appellant and Kebede, they drove by the victim's house, planning a robbery. Schrijver rang the doorbell and asked to use the telephone, while the others hid in the shadows on the victim's front porch. When the victim returned with his cell phone, appellant came out of the shadows with his gun pointed at the victim. In the ensuing struggle, appellant shot the victim in the groin. The struggle having ended, and with the victim pleading for his life, appellant coldly backed up and shot the victim again in the chest and neck/shoulder area, thereby causing the victim's death.

Susan Bass's brother testified that he saw appellant and his co-defendants leave the house he shared with his sister and Baker on the night of the robbery; all four men were wearing gloves. Susan Bass stated that she saw appellant and Schrijver handle the murder weapon on the evening of the murder. She also asserted that on May 4, 2007, she heard appellant boast about shooting the victim in the foot, stomach, and head. Finally, Pendleton and Forry testified that appellant admitted to them that he shot the victim. The trial testimony of Bass, Pendleton, and Forry was consistent with statements they had given to police in May 2007, shortly after appellant and his companions were arrested. This evidence was in addition to that of appellant's co-defendants and was on its own sufficient to permit the jury to conclude that appellant shot the victim and caused his death.

The Commonwealth clearly met its burden to prove, beyond a reasonable doubt, that appellant intentionally caused the victim's death. 18 Pa.C.S. §§ 2501(a), 2502(a), (d). Accordingly, the record supports appellant's conviction for murder in the first degree.

## II. Weight of the Evidence

Appellant's second claim is that the jury's verdict is against the weight of the evidence. Appellant argues that, although this Court may not substitute its assessment of the witnesses' credibility for that of the jury, the Court should recognize that the verdict in this case was based upon "mere surmise or conjecture." According to appellant, the verdict was premised on the unreliable testimony of "the more culpable defendant"—Schrijver—"who among other damning pieces of evidence, admitted bringing the gun to the exact scene of the shooting, hiding the gun after the shooting and admittedly lied to the police on so many occasions, about [too] many things" to include in the brief. Appellant's Brief at 28–29 (citing *Farquharson*, 354 A.2d at 550). Appellant asserts that the prosecution's sole evidence of his participation in the murder was testimony from co-defendants, who had motive to lie and implicate appellant. According to appellant, both Schrijver

and Baker were exposed as liars on cross-examination and by Mrs. Diener's testimony.

Appellant states that Mrs. Diener identified only two, not four, males at the scene, both white and who could be brothers, one with facial hair and the other with a bowl cut. According to appellant, Mrs. Diener's description matched Schrijver and Baker, and not appellant. Both co-defendants were corrupt sources of evidence with an incentive to implicate appellant, who had no ties to the victim and no motive to shoot him. Appellant asserts that the verdict is contrary to the weight of the evidence and that, as a result, he is entitled to a judgment of acquittal or a new trial.

The Commonwealth responds that the jury credited the testimony of the co-defendants, both of whom identified appellant as the shooter. Further, other evidence supported the verdict. Chad Forry, appellant's co-worker, testified that appellant bragged to him about shooting the victim. The Commonwealth contends that this Court should defer to the jury, which was in the best position to assess the credibility of witnesses. According to the Commonwealth, an assertion that a different conclusion could have been drawn from the same facts is not sufficient for relief on a challenge to the weight of the evidence. The Commonwealth emphasizes that the verdict was not "irreconcilably contradictory to incontrovertible facts, human experience of the laws of nature or based on mere conjecture." Commonwealth's Brief at 33 (citing *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 752 (2000)).

The trial court agreed with the Commonwealth. The court reasoned that the jury was instructed that Schrijver and Baker were accomplices and on how the jury should evaluate the testimony of accomplices. According to the trial court, the jury could choose whether to accept or reject Schrijver's and Baker's testimony, and the jury "obviously chose to believe them in this case." The court thus rejected appellant's weight of the evidence argument.

The finder of fact—here, the jury—exclusively weighs the evidence, assesses the credibility of witnesses, and

may choose to believe all, part, or none of the evidence. *DeJesus*, 860 A.2d at 107. Issues of witness credibility include questions of inconsistent testimony and improper motive. *Id.* A challenge to the weight of the evidence is directed to the discretion of the trial judge, who heard the same evidence and who possesses only narrow authority to upset a jury verdict. *Blakeney*, 946 A.2d at 652–53. The trial judge may not grant relief based merely on "some conflict in testimony or because the judge would reach a different conclusion on the same facts." *Id.* at 653. Relief on a weight of the evidence claim is reserved for "extraordinary circumstances, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* (quotation marks omitted). On appeal, this Court cannot substitute its judgment for that of the jury on issues of credibility, or that of the trial judge respecting weight. *DeJesus*, 860 A.2d at 107. Our review is limited to determining whether the trial court abused its discretion; the Court's role precludes any *de novo* consideration of the underlying weight question. *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1178 (2009); *Blakeney*, 946 A.2d at 653.

Here, appellant cites this Court's decision in *Farquharson* for the proposition that the verdict was "pure conjecture" because it was premised on trial testimony from co-defendants with motives to lie, who were admitted liars, and who provided several versions of the events to the police and at trial. Appellant also emphasizes supposed "inconsistencies" between Mrs. Diener's identification of two perpetrators and the co-defendants' testimony that four persons participated in the murder.

The *Farquharson* Court indeed stated that "where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." 354 A.2d at 550. But, the evidence in this case required no jury conjecture. Schrijver and Baker gave direct evidence. Moreover, the evidence was not limited to testimo-

ny from the co-defendants. The Commonwealth introduced testimony from other witnesses, *i.e.*, Marcus Pendleton and Chad Forry, who testified that appellant confessed to shooting and killing the victim. This evidence, combined with the physical evidence, proved guilt independently of Schrijver and Baker. Also, the trial statements of Susan Bass, her brother, Mrs. Diener, and the police and forensic investigators corroborated essential parts of Schrijver and Baker's testimony, including that the four men left Bass's house together wearing gloves; that the four men were secretive about the purpose of their outing; that the victim pled for his life; and that the victim was shot in the chest and neck after falling down on the porch. Mrs. Diener confirmed that one of the men was wearing a red shirt, which matched that worn by appellant on the night of the murder. Mrs. Diener also emphasized that she was focused on her fallen husband when she walked onto the porch on May 2, 2007, and that it was her belief there were but two men there only because of their conversation. This testimony corroborates Schrijver's statements that Baker and Kebede were at first hiding on either side of the front door and then ran from the porch. In her statements to police, Mrs. Diener described the two perpetrators she heard as male, 5'8"–5'9", and "white because they weren't black." Mrs. Diener also said she "[didn't] know if they were Mexican or [H]ispanic or Spanish." The description fit appellant, as well as his co-defendants.

In his argument, appellant does not account for the entire record and instead selectively emphasizes the testimony of his accomplices, which he says, was unreliable. That is a jury argument. Viewed in its entirety, the evidence of record is neither so unreliable nor contradictory to undermine the verdict. Differences in eyewitness accounts that were contradictory are not of such significance as to render the testimony of Schrijver and Baker mere conjecture or render it unreliable. *See DeJesus*, 860 A.2d at 107. Moreover, questions regarding Schrijver and Baker's motives or prior inconsistent statements were classic issues of credibility to be decided by the jury. Appellant had ample opportunity to impeach his

accomplices' credibility during cross-examination and, indeed, was able to develop the accomplices' motives and highlight inconsistencies between the multiple police statements and the trial testimonies of Schrijver and Baker. Notably, although the details in the various statements differed, Schrijver and Baker consistently identified appellant as the shooter. Appellant's confessions corroborated the identification. The jury chose to believe the accomplices' corroborated account that appellant was the shooter. "The trial court was in the best position to assess whether this was one of those rare circumstances where a verdict based on sufficient evidence was nevertheless contrary to the weight of the evidence." *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1178 (2009). We discern no abuse of discretion in the trial court's refusal to disturb the jury's credibility determinations here. *See id.* No relief is warranted.

### III. Sufficiency of the Evidence: Robbery

Appellant also argues that the evidence was insufficient to prove his guilt on the robbery charge. According to appellant, in the criminal Information, the Commonwealth framed the robbery charge very narrowly to allege that the victim was killed during "the theft of [his] cell phone and nothing else." Appellant's Brief at 19. Appellant asserts that there was no attempt, conspiracy, or actual theft of the victim's cell phone because neither appellant nor his accomplices had made a plan or formed any specific intent to steal the cell phone. Instead, he says, Schrijver simply requested to use the cell phone, which the victim voluntarily handed to him, and then Schrijver left with the cell phone in the confusion that followed the shooting. According to appellant, none of the actions leading up to the shooting were in furtherance of a theft of the cell phone. As a result, appellant claims, the victim's injuries were not inflicted during a theft of the cell phone and the Commonwealth was unable to meet its burden of proof on the count of robbery as alleged in the information. Moreover, appellant claims that because the only aggravating factor found by the jury was that the murder occurred during the

commission of the felony of robbery, appellant's death sentence should be vacated.

The Commonwealth responds that appellant's reading of the criminal Information is overly technical and narrow. Trial testimony established that, on the night of the murder, appellant and his cohorts drove toward Elizabethtown looking for an isolated location seeking an opportunity to rob someone. By unfortunate happenstance, they found the victim, an older man who appeared to be alone, and approached his home. Appellant shot the victim but was only able to obtain a cell phone. According to the Commonwealth, appellant and his accomplices unlawfully took the moveable property of the victim and whether the cell phone was the object sought or not is inconsequential. Commonwealth's Brief at 24 (quoting 18 Pa.C.S. § 3921(a)). The Commonwealth concludes that the evidence of record was sufficient for the jury to find appellant guilty of robbery. The trial court agreed with the Commonwealth that testimony at trial established all of the elements necessary to prove appellant's guilt on the robbery charge and the aggravator.

Here, appellant purports to challenge the sufficiency of the evidence regarding the robbery offense. A sufficiency of the evidence claim requires an assessment of whether the evidence introduced at trial established the offense charged, *i.e.,* robbery. *May,* 887 A.2d at 753. Thus, in the first instance, the jury decides whether the Commonwealth met its burden of proof based on the trial court's instructions regarding the relevant law; the jury does not review or base its decision on the Information. The jury's decision is reviewed by the trial court on post-verdict motions or in its Rule 1925(a) opinion. If the trial court denies relief, on appeal, this Court reviews the trial court's decision for error. *See id.* Here, appellant does not develop any arguments in his appeal that address an absence from the trial record of evidence necessary to establish a robbery charge. As the Commonwealth explains, the record amply supports that appellant fatally shot the victim during an attempt to deprive the victim of his property. 18 Pa.C.S. § 3701(a)(1)-(2).

That circumstances made it such that appellant and his accomplices failed to obtain and remove money (or other valuables) is irrelevant because proof of an attempted theft is sufficient to establish the "in the course of committing a theft" element of robbery. *Id.*

Appellant's "sufficiency" arguments are focused on the Information filed by the Commonwealth pursuant to Rule of Criminal Procedure 560, after appellant was held for court. *See* Pa.R.Crim.P. 560. Generally, the Information "define[s]" the issues at trial. Pa.R.Crim.P. 560(D). The Information is the "formal written accusation of an offense made by the attorney for the Commonwealth, upon which a defendant may be tried, which replaces the indictment in all counties since the use of the indicting grand jury has been abolished." *Commonwealth v. Weigle*, 606 Pa. 234, 997 A.2d 306, 312 (2010) (quoting Pa.R.Crim.P. 103). Appellant claims that the discrepancy between the Information and the evidence introduced at trial, *i.e.*, the *allegata* and the *probata*, entitles him to sufficiency relief.[6] This issue essentially calls into question whether the Commonwealth provided sufficient notice of the robbery charge it intended to prove at trial. *See Commonwealth v. Sims*, 591 Pa. 506, 919 A.2d 931, 939 (2007) (rejecting claim that defendant did not have sufficient notice of attempt to escape charge of which he was convicted because Informa-

---

**6.** The Commonwealth described the robbery count in the Information as follows:

COUNT 2—ROBBERY—INFLICT SERIOUS BODILY INJURY—18 P[a.C.S.] 3701(A)(1)(i)—(FELONY 1) did during the course of committing a theft, inflict serious bodily injury upon another, threaten another with or intentionally put him in fear of immediate serious bodily injury; inflict bodily injury upon another or threaten another with or intentionally put him in fear of immediate bodily injury; TO WIT: actor and his accomplices did approach 1016 Ridge Rd, Elizabethtown PA, with the intent to rob any victim they encountered. Ray P. Diener did answer the door, and the actor and accomplices did request to use the phone under false pretenses. Mr. Diener obtained a cellular phone and Lorenzo Schrijver took the cellular telephone with an intent to deprive Mr. Diener of that property. Abraham Sanchez, Jr. then shot Mr. Diener three (3) times causing his death. Said offense occurred at 1016 West Ridge Rd., West Donegal Township, Lancaster County.
Information, 08/28/2007.

tion charged defendant with escape only; this Court remanded for lower court to address separate sufficiency of evidence claim). This is not a sufficiency issue, but a discrepancy issue. Yet, the record shows that appellant failed to object on the ground of notice when the Commonwealth introduced its evidence of the robbery.

 To raise his notice/discrepancy issue, appellant was required to object contemporaneously to the presentation of the evidence, during the prosecution's opening and closing arguments, or during the trial court's jury instructions, in order to give the trial court a contemporaneous opportunity to address the alleged error and to preserve the present issue for appeal. *See, e.g., Sims,* 919 A.2d at 933 (defense counsel objected to prosecutor's closing argument that defendant "should be convicted of 'at least attempted escape' " on ground that attempted escape was not charged in information). The purpose of contemporaneous objection requirements respecting trial-related issues is to allow the court to take corrective measures and, thereby, to conserve limited judicial resources. *See Criswell v. King,* 575 Pa. 34, 834 A.2d 505, 509–10 (2003) (listing policy considerations behind contemporaneous objection requirement). Appellant failed to raise any objection here and, instead, raised the issue for the first time via his Rule 1925(b) statement of matters complained of on appeal, in the guise of a sufficiency argument. The issue fails as a sufficiency argument because appellant's theory does not implicate evidentiary sufficiency. The notice/discrepancy argument appellant actually forwards fails because it was not raised below. Appellant's claim regarding robbery as an aggravator fails for the same reasons. No relief is warranted.

### IV. Batson Challenge

Next, appellant requests a new trial on the ground that he was denied a fair trial because the Commonwealth used a peremptory challenge to strike the only African–American death-qualified venire person from the jury. Appellant's Brief at 25 (citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). According to appellant, whose sur-

name is Hispanic but whose racial background is not identified in the record, the Commonwealth "purposefully excluded the only minority woman . . . on the unreasonable and barely believable premise that she may have noticed a newspaper article on the eve of trial and nothing more," even though the prosecutor acknowledged that the venire person did not read the article. *Id.* at 27 (emphasis omitted). Appellant asserts that the Commonwealth's justification "rings of gamesmanship and prejudice" because the Commonwealth accepted Caucasian venire persons who also noticed the same and other articles in the newspapers. Appellant also alleges that the Commonwealth used two other peremptory challenges to exclude African–American jurors who were not death-qualified and with regard to whom appellant did not raise a *Batson* challenge. Appellant contends that "[t]he Commonwealth took every opportunity to seat a predominantly white jury thereby denying [appellant] a fair trial." *Id.* at 28.

The Commonwealth counters that appellant fails both to carry the *prima facie* burden to establish a *Batson* violation, and to prove that the prosecutor's race-neutral explanation for striking venire person # 34 was a pretext for excluding her on the basis of race. The Commonwealth emphasizes that appellant has failed—both during *voir dire* and on appeal—to identify the race of all 132 venire persons, the race of those removed by the prosecution, or the race of those accepted by the Commonwealth but stricken by the defense. During *voir dire,* appellant simply objected by saying *"Batson* challenge, Your Honor," and the trial court immediately requested an explanation from the prosecutor. *See* N.T., 2/24/09, at 365. On appeal, the Commonwealth notes, appellant bases his allegations solely on the Commonwealth's exercise of peremptory strikes to excuse two other African–American venire persons (# 32 and # 97) who stated they would be unable to impose the death penalty, and with respect to whom the defense did not raise *Batson* challenges. Commonwealth's Brief at 29 (citing N.T., 2/24/09, at 336; N.T., 2/25/09, at 694). The Commonwealth also highlights that it accepted the only juror of Hispanic descent (# 79) not excused for cause. *Id.*

(citing N.T., 2/24/09, at 555). The Hispanic venire person (# 45) excused for cause was a local detective acquainted with the trial prosecutors. *Id.* & n. 4 (citing N.T., 2/24/09, at 416). The Commonwealth concludes that appellant failed to adduce sufficient evidence of *Batson* factors to make a *prima facie* case that venire person # 34 was excluded on the basis of her race.

Moreover, the Commonwealth recounts that the prosecutor provided three race-neutral reasons for striking venire person # 34: (1) the juror had noticed an article in the local newspaper which quoted defense counsel's comments regarding the strength of the Commonwealth's evidence against appellant, and which the Commonwealth had already brought to the trial court's attention; (2) she indicated during *voir dire* that she would need more than one witness and more than just witness testimony to find appellant guilty; and (3) she indicated during *voir dire* that she would have difficulty following the court's instruction with regard to what the evidence is and whether one witness's testimony, if believed, would be sufficient to convict. According to the Commonwealth, appellant does not account for all reasons provided by the Commonwealth, which the court properly credited as race-neutral. With respect to the article, which appellant claims "countless" other Caucasian venire persons read without being stricken, the Commonwealth argues that appellant is not sufficiently specific in his allegations as to the identity and circumstances of the other venire persons to whom he is referring. The Commonwealth emphasizes that all its race-neutral justifications for striking venire person # 34 were valid and that the record supports that the trial prosecutor's motivation was not discriminatory.

The trial court rejected appellant's claim. According to the court, the jury was composed of twelve white jurors, one Hispanic juror, and one juror who did not indicate his/her race. Although the Commonwealth used peremptory challenges to strike three African–American venire persons, appellant raised a *Batson* challenge only to the striking of venire person # 34. The trial court found that the Commonwealth

provided a race-neutral explanation for striking venire person # 34, and concluded that appellant failed to establish that the totality of the circumstances indicated that the prosecutor excluded potential jurors because of their race.

The *Batson* Court recognized that peremptory challenges "permit[ ] those to discriminate who are of a mind to discriminate" based on race in jury selection. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712; *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1042 (2002). "[T]he harm *Batson* seeks to avoid is not only a trial where members of the defendant's own race have been excluded from the jury on account of their race, but also the harm to the prospective jurors and the community at large that results when citizens are denied participation in jury service based upon their race." *Harris*, 817 A.2d at 1042–43 (citing *Powers v. Ohio*, 499 U.S. 400, 415–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (racial identity between excluded venire person and criminal defendant is relevant to establish *Batson* violation but not a requirement)). The successful *Batson* objector is the third party beneficiary of the venire person's equal protection right not to be excluded from a jury on account of his/her race.

To prove a defense-side *Batson* claim, the defendant has to initially establish "a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race." *Id.* at 1042. If the *prima facie* showing is made, "the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue." *Id.* The trial court ultimately makes a determination of whether the defense has carried its burden of proving purposeful discrimination. *Id.*

At trial, the Commonwealth did not actively dispute the existence of a *prima facie* case under *Batson*. Further, the trial court did not address this initial aspect of the multi-prong *Batson* inquiry either in court or in its Rule 1925(a) opinion and instead focused, like the parties, on whether the prosecutor's explanation of the peremptory strike was race-neutral. On appeal, the Commonwealth challenges appellant's *prima*

*facie* showing both at trial and on appeal. But, we will not decide the issue of whether appellant met his *prima facie* burden. As in *Harris* and *Edwards,* we recognize that the U.S. Supreme Court's plurality decision in *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) suggests that, in these circumstances, we may turn directly "to the question of whether the appellant had carried his burden of proving that the prosecution had struck the juror based on race." *Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139, 1154 n. 16 (2006) (quoting *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859; *Harris,* 817 A.2d at 1044). We again take the same approach here and address the second and third prongs of the *Batson* test. *Id.* at 1154–55.

In *Edwards,* we explained that, once the burden shifts from the *Batson* defendant, the prosecution's obligation is to forward a facially valid race-neutral explanation and, in this regard, there is no "demand [for] an explanation that is persuasive, or even plausible. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 1154 (quoting *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). The trial court then assesses the persuasiveness of the race-neutral explanation, and determines whether the challenger ultimately carried his burden of proving purposeful discrimination. *Id.* Where, as here, there is little evidence bearing on the issue of the prosecutor's discriminatory intent, and the best evidence is the demeanor of the attorney who exercises the challenge, the trial court's determination will turn on the court's assessment of the prosecutor's credibility. *Id.* at 1155; *Harris,* 817 A.2d at 1043 (citing *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859). Accordingly, we may overturn the trial court's decision only if it is clearly erroneous. *Harris,* 817 A.2d at 1043 (citing *Hernandez,* 500 U.S. at 363–70, 111 S.Ct. 1859); *Edwards,* 903 A.2d at 1155.

Here, the record shows that the prosecutor asked all potential jurors, including venire person # 34, whether, based on television shows, she would expect the Commonwealth to present fiber, DNA, and other similar evidence in order to and

as a requirement to convict somebody of a crime. Venire person # 34 answered in the affirmative. Moreover, venire person # 34 expressed her hesitation to accept the court's instruction that "words are evidence ... because people lie" and unequivocally stated that she would be unable to convict a criminal defendant on the basis of the testimony of a single witness, even if she found the witness credible. N.T., 2/24/09, at 356–57. Venire person # 34 also mentioned that she saw an article on the front page of the newspaper, in which defense counsel was interviewed regarding appellant's case and regarding which the prosecution had expressed concern earlier during *voir dire*. *Id.* at 349; *see* N.T., 2/23/09, at 136–40. After appellant asserted the *Batson* challenge, the prosecutor provided the following explanation:

Well, Your Honor, it begins with, she's the first individual who has indicated that she noticed the article in the paper. And I do understand she said she did not read it; however, that is a risk that we are not willing to take because of the concerns which we relayed to the [c]ourt yesterday about the contents of the article. And the article itself was actually marked as an exhibit yesterday.

Additionally, Your Honor, the prospective juror actually indicated in response to the question—she's the first one that has responded this way—that she needs more than just words from the witness stand. With regard to the CSI stuff, she did say, yeah, I want something in addition to words from the witness stand.

In addition to that, in response to questions by both sides, she essentially said she would have an issue with following the Court's instruction with regard to what the evidence is, and she's continuously said that she requires more than just that witness, who, even if believed, she would want more.

N.T., 2/24/09, at 365–66.

■ Early in the *voir dire* process, the Commonwealth brought to the attention of the trial court an article in which defense counsel specifically addressed the credibility of the Commonwealth's incarcerated witnesses. N.T., 2/23/09, at 136–40. The Commonwealth explains further in its appellate

brief, that "eye witness testimony was crucial to establishing [appellant] as the shooter" and that the prosecutor was "justifiably concerned by [venire person] # 34's reluctance to convict even if presented with credible eye witness testimony." Commonwealth's Brief at 32. The trial court, which was in the best position to assess the credibility of the prosecutor, determined that the race-neutral explanation offered was persuasive. Appellant challenges only one of the Commonwealth's race-neutral explanations and adduces no evidence in support of his bald assertion of discrimination. Under these circumstances, he has not shown that the trial court's exercise of discretion was clearly erroneous. *See Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 631 (1995) (use of peremptory strike on single African–American venire person, without more, is insufficient to establish *Batson* violation). Appellant is not entitled to *Batson* relief.

### V. *Emotional Outbursts from the Victim's Family*

Appellant also argues that he was denied a fair trial because of "repeated emotional outbursts by the victim's family during critical parts of the trial causing significant juror distraction and significant prejudice." Appellant's Brief at 7 (Statement of Questions). Notably, appellant neither requested a remedial instruction at the time of the incident nor did he move for a mistrial. Appellant simply requested that the victim's daughter—the sobbing spectator—be removed from the courtroom or privately warned against crying by the trial court. The trial court stated that the victim's family had a right to be in the courtroom, that the daughter was trying to control herself and that her actions were not disturbing the trial. *See* N.T., 3/2/09, at 1225–26, 1253–55; N.T., 3/3/09, at 1537–42.

On appeal, appellant asserts that the trial court erred by refusing to remove, reprimand, or warn family members to cease any outbursts, following appellant's objection. In the argument section of his Brief, appellant develops the claim only to declare that, although prejudice resulting from spectator shows of emotion could be cured by a remedial jury instruction, a curative instruction would have been insufficient

here. According to appellant, repeated requests for removal were denied and were "pointless since the damage had already been done." Appellant's Brief at 17.[7]

In response, the Commonwealth describes three incidents of the victim's daughter "lightly sobbing for only brief periods of time." These incidents, to which appellant objected, occurred during the testimony of police officers describing the victim's body and his home, and during Mrs. Diener's testimony. The Commonwealth states that appellant failed to request a curative or cautionary instruction or to otherwise object. The Commonwealth argues that appellant has not shown that the trial court abused its discretion.

The trial court explained in its Rule 1925(a) opinion that what defense counsel described as "loud sobbing by the spectators" were not outbursts but "slight moaning at best," which were "relatively short in duration." Tr. Ct. Op., 12/1/09, at 3 (unnumbered) (citing N.T., 3/2/09, at 1225–26, 1253–54). According to the trial court, emotional reactions from the victim's family are not unusual in murder trials. The court stated that it did not remove or reprimand the victim's daughter because the incidents were short and she attempted to control herself. Further, the jury did not receive a curative or cautionary instruction because appellant did not seek one.

To obtain relief on a claim that the trial court abused its discretion in responding to spectator conduct at trial, appellant must show that the spectator's actions caused actual prejudice or were inherently prejudicial. *Commonwealth v. Philistin*, 565 Pa. 455, 774 A.2d 741, 743 (2001); *see Carey v. Musladin*, 549 U.S. 70, 73, 127 S.Ct. 649, 166 L.Ed.2d

7. It is unclear whether appellant's claim on appeal refers to one or to multiple spectators. Appellant's Brief at 17 ("[d]efense requested the court remove the individual(s) causing the disruption"). The record reveals that appellant made a generalized objection at trial, referring to "spectators," but then he specifically identified only one person, the victim's daughter, as sobbing. *See* N.T., 3/2/09, at 1225–26, 1253–54; N.T., 3/3/09, at 1537–42. Because there is no evidence in the record regarding the conduct of any other spectator except the victim's daughter, we proceed to address appellant's claim only as it relates to her conduct.

482 (2006). The U.S. Supreme Court has held it is still an open question as to whether spectator versus state conduct can be inherently prejudicial. *Carey*, 549 U.S. at 76, 127 S.Ct. 649 (citing *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). The trial court has discretion to determine whether a party was prejudiced by a spectator's conduct. *Philistin*, 774 A.2d at 743; *Commonwealth v. Bracey*, 541 Pa. 322, 662 A.2d 1062, 1072 (1995). The trial court may implement any appropriate remedy requested, including offering a remedial instruction, removing the responsible spectator, or declaring a mistrial. *See, e.g., Bracey*, 662 A.2d at 1072; *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97, 104–05 (1995); *Commonwealth v. Styles*, 494 Pa. 524, 431 A.2d 978, 980–81 (1981). "[U]nless the unavoidable effect of the incident is to deny the defendant a fair trial, there is no error." *Philistin*, 774 A.2d at 743; *Johnson*, 668 A.2d at 104.

 Here, appellant takes an absolutist approach, framing his argument on the assumption that spectator conduct is inherently and irremediably prejudicial. But, the law does not support an assumption of inherent prejudice regarding private conduct, and appellant fails to develop sufficient argument to persuade us that such a presumption is warranted. *See Carey, supra.* Further, appellant fails to develop factual or legal support in favor of finding actual prejudice in this instance. Thus, appellant's description of the nature and prejudicial effect of private conduct during trial consists merely of bald assertions that unnamed spectators' outbursts were disruptive and caused "significant juror distraction and significant prejudice." The trial judge, who was present, determined otherwise. On the present record, we cannot conclude that the trial court abused its discretion in denying appellant's request to remove or warn the victim's family against expressing emotion during trial.[8]

8. Further, although appellant offered a point of charge on the issue of emotional outburst by family members which the court refused to read to the jury, appellant did not object on this basis to the jury instruction, did not raise this issue in his Rule 1925(b) statement, and did not raise and develop such a claim in this Court. *See* N.T., 3/6/09, at 2294–96.

## VI. Photographs of the Victim's Body

Next, appellant asserts that the trial court erred or abused its discretion in admitting into evidence and showing to the jury the victim's clothing from the night of the murder, as well as photographs depicting the victim's body. Specifically, appellant questions the admission of Commonwealth Exhibits 20, 13, and 14.[9] According to appellant, because the location and position of the body, and ballistic issues to which the victim's clothing was relevant, were not disputed, the photographs and clothing had no legitimate purpose and evidentiary value. Instead, the Commonwealth presented the evidence "for shock value." Appellant seeks a new trial. Appellant's Brief at 17–18.

The Commonwealth responds that appellant waived any issue regarding the admissibility of the photographs by failing to object when they were introduced into evidence. According to the Commonwealth, the parties agreed in chambers that covering the victim's body would negate any inflammatory effect that the photographs might have on the jury; subsequently, appellant did not object at trial when the redacted photographs were shown to the jury. Moreover, the photographs were relevant to explain the presence and location of blood stains and of a footprint near the victim's body, as well as to corroborate the testimony of Schrijver and Baker. The Commonwealth states that it sought to anticipate any possible defenses, because appellant's trial strategy was not yet clear when the items were introduced. Finally, the Commonwealth asserts that the photographs "lost any inflammatory effect" when the victim's body was covered.

With respect to the clothing, the Commonwealth states that the victim's shirt and boxer shorts were introduced into evidence to help the Commonwealth's ballistics expert explain the range from which appellant shot the victim. The clothing, however, was not removed from the evidence bag and was not shown to the jury. Rather, the expert simply identified the

9. Based on his description of the photographic evidence challenged, appellant also appears to question the admission of Commonwealth Exhibit 22.

items and then testified to his conclusions on the basis of the evidence.

The trial court agreed with the Commonwealth that appellant raised no objection to the admission of the photographs (Commonwealth's Exhibits 20 and 22). The court also rejected appellant's claim regarding these Exhibits on the ground that no images of the victim's body were ever shown to the jury. Finally, the trial court summarily dismissed appellant's claim regarding the victim's clothing (Commonwealth's Exhibits 13 and 14) on the ground that the evidence was relevant and "necessary for the testimony of the Commonwealth's ballistics expert." Tr. Ct. Op., 12/1/09, at 4 (unnumbered).

 The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error. *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 776 (2004) (citing *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 405 (2003)). Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. But, "[a]lthough relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403. A determination of whether photographic evidence alleged to be inflammatory is admissible involves a two-step analysis. "First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury." *Malloy*, 856 A.2d at 776 (quoting *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726 (1998)); *Freeman*, 827 A.2d at 405 (images of victims' bodies with partially or totally obscured wounds were not "especially inflammatory" and were admissible to prove specific intent to kill). The availability of alter-

nate testimonial evidence does not preclude the admission of allegedly inflammatory evidence. *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 531 (2003).

On the first day of trial, March 2, 2009, the parties and the court addressed whether several photographs of the victim's body would be admitted into evidence. *See* N.T., 3/2/2009, at 1372–79. One photograph is described in the transcript as a color photograph of the victim with his eyes and mouth open, and blood on his chest and boxer shorts. The victim's body is pictured on the porch, moved from its original location, and, surrounding him, are various blood stains and a bloody footprint attributed to the investigators. *Id.* at 1372–74. The Commonwealth agreed to cover the body and stated it would offer the altered photograph into evidence to explain the bloody footprint and the sequence of events. *Id.* at 1375–78. On March 3, 2009, the Commonwealth marked the photograph—with the victim's body covered—as Exhibit 20.[10] Appellant's trial counsel noted that he would have preferred that the photograph had not been offered into evidence at all but that covering the body was "a reasonable compromise." N.T., 3/3/09, at 1510–11. Subsequently, the Commonwealth moved for admission into evidence and asked for permission to publish Exhibit 20, without objection from appellant. *Id.* at 1535.

At the conference on March 2, the parties also addressed another photograph, which was included in a larger collection and PowerPoint presentation of photographs from the scene of the murder. Appellant's trial counsel described the photograph as depicting the victim's body entirely covered by a sheet except for a foot protruding from under the sheet. *See* N.T., 3/2/2009, at 1378. In chambers, counsel tentatively stated that "the foot poking out from under the sheet makes it kind of gruesome looking" and continued that he was not "pushing the issue." *id.* The Commonwealth offered the presentation, including the subject photograph, into evidence as Exhibit 22. Appellant objected neither to the admission of

10. The record contains no description of how the victim's body was "covered" in the photograph. Appellant, however, raised no objection to the manner of redaction.

the presentation nor to the individual photograph of the victim. *See* N.T., 3/3/09, at 1522–59.

An independent review of the record reveals that this evidence was not particularly inflammatory in the context of a murder trial. In reaching this conclusion, we note that the trial Exhibits, including the photographs in question, were not included in the record on appeal and we reviewed the description of Exhibits 20 and 22 from the trial transcript. *See Commonwealth v. Almodorar,* 20 A.3d 466 (Pa.2011) (*per curiam*) ("duty is on the appellant to initiate the action necessary to provide the appellate court with all the documents necessary to allow a complete and effective appellate review"). The victim's body was covered in both instances and our review reveals that the gruesome nature of the victim's foot is overstated. The photographs were relevant to explain extraneous evidence at the scene and the sequence of events, and ultimately to prove appellant's specific intent to kill the victim. Accordingly, we cannot conclude that the trial court abused its discretion in admitting Exhibits 20 and 22. *Freeman,* 827 A.2d at 405. Moreover, in conference, appellant's counsel indicated that admission into evidence of Exhibits 20 and 22 was acceptable; counsel also did not raise objections when the two Exhibits were marked and published to the jury. Nor did he request an instruction or a mistrial. Where the parties agree to the redaction of a photograph, and the redacted photograph is then moved into evidence, there can be no trial court evidentiary error. *See id.* (citing *Baez,* 720 A.2d at 727 (no error in admitting videotape of murder victim's body where prosecutor and defense counsel participated in redaction of tape)).

The trial court also admitted into evidence Commonwealth Exhibits 13 and 14, the victim's shirt and boxer shorts; both items were stained with the victim's blood. At sidebar, appellant's counsel objected to the publication of the victim's shirt (Exhibit 13) to the jury on grounds that the prejudicial value of the exhibit outweighed its probative value. N.T., 3/3/09, at 1431–32. The trial court sustained the objection and

the Commonwealth asked its testifying expert to identify the victim's shirt without publishing it to the jury. *Id.* at 1435–36. Subsequently, although the defense did not renew its objection, the Commonwealth moved the boxer shorts (Exhibit 14) into evidence and elicited expert testimony without publishing the boxer shorts to the jury. *See id.* at 1437–38. Both the shirt and the shorts were shown only to the expert in their original evidence bags. *Id.* at 1436, 1438. The Commonwealth introduced its Exhibits 13 and 14 into evidence to rebut a defense argument that additional holes in the garments cut out by the serology expert were actually separate bullet holes. Therefore, the exhibits were relevant and not clearly inflammatory. Appellant fails to develop any arguments regarding the prejudicial effect of showing the expert the evidence bag containing the victim's bloody clothing. On the present record, we cannot conclude that the trial court abused its discretion by admitting Exhibits 13 and 14 into evidence for the limited purpose of permitting the Commonwealth's expert to examine those Exhibits as they remained in their respective evidence bags. Appellant's claims regarding Commonwealth Exhibits 20, 22, 13, and 14 fail.

## VII. *Factfinder and Timing of Atkins/Mental Retardation Adjudication*

Appellant's seventh claim is that the trial court erred in permitting the jury to decide at the penalty phase whether appellant was mentally retarded and, therefore, exempt from the death penalty pursuant to the U.S. Supreme Court's decision in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). According to appellant, the issue of mental retardation should have been decided by the trial court before trial. Appellant argues that "complex legal issues" like mental retardation, insanity, and competency are best decided by experienced trial judges rather than easily confused and inexperienced lay persons. He expresses doubt that the General Assembly, if it were to pass upon implementation of *Atkins,* would entrust such difficult questions to a jury. Appellant further claims that this Court's decisions in *Common-*

*wealth v. Vandivner,* 599 Pa. 617, 962 A.2d 1170 (2009) and *Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128 (2009) suggest that the proper manner to address an *Atkins* claim is in a pre-trial decision by the court.

Appellant notes that he requested a bench *Atkins* determination on the morning of the first day of trial, before jury selection began. He asserts that any cost associated with a delay in the commencement of trial due to the timing of his request was justified given the alternatives, *i.e.,* the social cost of an unfair trial and the financial burden of a new trial. According to appellant, because the court refused to resolve the *Atkins* issue non-jury, before trial, he was forced to select and try his case before a death-qualified jury and to change his trial strategy, which placed him at an unfair disadvantage violative of his constitutional due process rights. Appellant claims that the trial court's error "severely prejudiced" him.

The Commonwealth responds that caselaw permits a trial court to decide a baseless *Atkins* claim, like appellant's, before trial or to defer the decision to a jury at sentencing. The decision in *Vandivner* simply "prevented a baseless claim from impeding the imposition of the death penalty," without creating a mandatory procedure. Commonwealth's Brief at 9. Meanwhile, the Commonwealth notes, the *Bracey* decision addressed *Atkins* issues in post-conviction practice rather than trial issues. The Commonwealth also argues that appellant's *Atkins* claim was baseless on the merits because appellant was unable to establish that his intelligence quotient ("IQ") was in the range of mental retardation, *i.e.,* below 70. *Id.* (citing *Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624 (2005)). Furthermore, the Commonwealth emphasizes, appellant presented his claim to the trial court on the morning of *voir dire,* and requested a hearing and decision which would have denied the Commonwealth an opportunity for expert review and would have stopped the trial "in its tracks." *Id.* at 11. In addition, at the time that appellant moved for a decision, he was unable to provide expert reports, which only became available during jury selection, on February 24–25, 2009.

According to the Commonwealth, the law did not preclude the trial court from submitting the *Atkins* issue to the jury. Pursuant to Section 9711 of the Judicial Code, 42 Pa.C.S. § 9711, juries already have the power to decide life or death following deliberation on aggravating and mitigating circumstances, which can encompass evidence of mental retardation and mental disturbance or impairment. Therefore, the issue of mental retardation may properly be presented to the jury whether under *Atkins* or as a mitigator. According to the Commonwealth, appellant suffered no prejudice from submission to a jury specifically instructed by the trial court to determine first whether appellant proved that he suffered from mental retardation, and if he did not, to determine whether to return a sentence of death.

The trial court rejected appellant's procedural claim, and his related request for an opportunity to select a non-death qualified jury, on the ground that appellant raised the *Atkins* claim too late for a pre-trial hearing. According to the court, appellant presented his expert reports during jury selection and did not provide the Commonwealth with sufficient notice to prepare its own report. Holding a hearing before trial would have also required stopping jury selection and delaying trial. For those reasons, the court submitted the *Atkins* issue to the jury, with an instruction to not "direct the deliberations toward the death penalty until the decision on mental retardation was made." Tr. Ct. Op., 12/1/09, at 2 (unnumbered).

We now review the trial court's decision to submit appellant's *Atkins* claim to a jury during the penalty phase of trial, in the circumstances here, and we also address appellant's primary assertion that he was entitled to a pre-trial bench adjudication of his mental retardation claim.

In *Atkins,* the U.S. Supreme Court, overruling prior authority, decided that the U.S. Constitution, the Eighth Amendment through Fourteenth Amendment Due Process in particular, "places a substantive restriction on [a] State's power to take the life of a mentally retarded offender." 536 U.S. at 321, 122 S.Ct. 2242. The High Court did not dictate

either a national standard for determining which offenders are in fact mentally retarded, nor did it speak of a constitutionally-mandated procedure for determining mental retardation in capital cases. *See id.* at 317, 122 S.Ct. 2242. "[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences," the Court stated. *Id.; accord Medina v. California,* 505 U.S. 437, 443–44, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) ("it has never been thought that decisions under the Due Process Clause establish [the U.S. Supreme] Court as a rulemaking organ for the promulgation of state rules of criminal procedure"). Unlike legislatures in several sister states, in the nine years since the decision in *Atkins,* our General Assembly has not enacted legislation addressing the issues left open to the states by *Atkins.*[11] *See, e.g.,* Va.Code § 19.2–264.3:1.1(C) (2003); Cal.Penal Code § 1376(b) (2003); 11 Del. Code § 4209(d)(3) (2002). The delay has caused uncertainty in the lower courts and among criminal law practitioners, and could lead to different standards and procedures being employed in different courtrooms throughout the Commonwealth. *Accord Morrow v. State,* 928 So.2d 315, 322 (Ala.Crim.App. 2004) (creating interim *Atkins* procedure pending action by legislature, citing principle that "justice delayed is justice denied"); *Ex parte Briseno,* 135 S.W.3d 1, 5 (Tex.Crim.App. 2004) (same). Faced with the continuing inaction of our General Assembly, we will exercise our constitutional power of judicial administration to devise a procedure for implementing the *Atkins* decision in Pennsylvania. *See* PA. CONST. Art. V, § 10(c).

11. Several bills were introduced to set standards for adjudicating mental retardation in Pennsylvania, but none were enacted into law. *See Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624, 633 (2005) (Eakin, J., concurring); *see, e.g.,* S.B. 397, 2011–12 Gen. Assem., Reg. Sess. (Pa.2011); S.B. 628, 2009–10 Gen. Assem., Reg. Sess. (Pa.2009). Thus, while acknowledging that a definition of mental retardation from the General Assembly would have been preferable, left with the legislative void, the *Miller* Court adopted a mental retardation standard under *Atkins* to prevent further delays in the trial and decision of cases. *Id.* at 633 n. 11. We are now called upon to fill a similar void concerning other aspects of *Atkins.*

Devising an *Atkins* procedure entails deciding who—judge or jury—must or may adjudicate a capital defendant's claim of mental retardation, the timing of such a determination, which party bears the burden of proof, and the level of proof required. 536 U.S. at 317, 122 S.Ct. 2242. Here, appellant's argument does not focus on every aspect of *Atkins*, but instead addresses only the identity of the factfinder and the timing of the *Atkins* determination. Our caselaw applying *Atkins* in state court criminal trials has addressed these questions only incidentally, without affirmatively answering them. For example, in *Vandivner*, the trial court indeed held a pre-trial bench hearing on the defendant's claim that he was mentally retarded. 962 A.2d at 1174. But, on direct appeal, Vandivner did not challenge either the timing or the propriety of the bench adjudication; rather, he simply asserted that he met the definition of mental retardation in Pennsylvania. *Id.* at 1183–88 (citing *Miller*, 888 A.2d at 631).[12] This Court affirmed the conviction for first-degree murder and the sentence of death without addressing the propriety of the unchallenged procedure employed by the trial court to address Vandivner's *Atkins* claim. In *Bracey*, the post-conviction court also offered the defendant a bench hearing on his collateral *Atkins* claim, but the defendant refused to introduce evidence, arguing that the U.S. Constitution mandated a hearing before a jury on a collateral *Atkins* claim. We held that a criminal defendant is not "entitled" to have a jury entertain his post-conviction *Atkins* claim, and remanded for the bench hearing. *Bracey*, 986 A.2d at 130, 146–47. We rejected the claim that the Sixth Amendment created a right to a jury trial for the purposes of an *Atkins* claim in post-conviction proceedings, and instead enforced the Rules of Criminal Procedure, which designate judges as PCRA factfinders. *Id.* at 135, 140–41, 146 (citing *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S.

---

**12.** In *Miller*, we did not address the question of whether an *Atkins* claim was to be resolved at trial by a judge or jury because the issue of mental retardation was raised on collateral review under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–46. *Miller*, 888 A.2d at 627 n. 3.

466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); Pa.R.Crim.P. 908(D)(1). *Accord Schriro v. Smith*, 546 U.S. 6, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005) (*per curiam*).[13]

 Contrary to appellant's argument here, these decisions finding no error with the merits of a pre-trial bench determination and rejecting a claim of entitlement to a jury adjudication of a collateral *Atkins* claim neither established a procedure nor suggested a preference for, much less an entitlement to, a pre-trial bench decision of timely-raised *Atkins* claims. As the absence of a constitutional right does not usually imply the existence of the opposite of that right, appellant's reliance on supposed implied holdings in *Bracey* and *Vandivner* is unavailing. *Cf. Singer v. U.S.*, 380 U.S. 24, 34–35, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) ("ability to waive constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right"). At present, therefore, there is no support for appellant's claim that a pre-trial

13. Although *Bracey* addressed an asserted federal constitutional right to a jury decision of *Atkins* mental retardation in post-conviction proceedings, the Court's reasoning in rejecting any such entitlement to a jury claim is instructive with respect to *Atkins* proceedings at trial. *Bracey* had relied on the *Apprendi/Ring* principle that "if a State makes an increase in a defendant's authorized punishment contingent on [a] finding of fact, that fact—no matter how the state labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. 2428; *Apprendi*, 530 U.S. at 482–83, 120 S.Ct. 2348. Bracey argued that the maximum punishment for first-degree murder in Pennsylvania was life imprisonment and only defendants who were not mentally retarded were subject to the "increased" punishment, the death penalty. *Bracey*, 986 A.2d at 135. But, we rejected the application of *Ring* in the *Atkins* context, explaining that the decision in *Atkins* "did nothing to change Pennsylvania's statutory scheme for determining that class of defendants who meet the statutory criteria to render them eligible for the death penalty" and operated instead "as an external restriction upon existing state prerogatives, by 'exempting' certain members of that otherwise eligible class from the imposition of the death penalty because of Eighth Amendment concerns." *Id.* at 146. We noted that the *Ring* Court's concern was with facts that increased a statutory penalty but that "only a decrease," not an increase, was predicated on the outcome of a mental retardation adjudication. *Id.* at 146 n. 17. On this basis, we rejected the claim that a jury adjudication of the *Atkins* issue was constitutionally mandated. *Accord State v. Laney*, 367 S.C. 639, 627 S.E.2d 726, 731 (2006); *State v. Hill*, 177 Ohio App.3d 171, 894 N.E.2d 108, 120 (2008).

bench decision is the approach to *Atkins* adjudications supported, or required, by existing caselaw from this Court.

Recognizing that no statute, caselaw, or Rule currently outlines a proper *Atkins* procedure, we also acknowledge that any pronouncement on *Atkins* procedure cannot trump constitutional rights, if any exist, regarding a particular factfinder or as regards the timing of the mental retardation adjudication. *See Bracey*, 986 A.2d at 141; *accord Leland v. Oregon*, 343 U.S. 790, 799, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (Court refused to interfere with state procedure which did not violate due process). Therefore, we next address the constitutional underpinnings and implications of appellant's arguments in favor of devising for Pennsylvania an *Atkins* procedure conferring a defense right to a pre-trial bench determination. *Bracey*, 986 A.2d at 141; *accord State v. Grell*, 212 Ariz. 516, 135 P.3d 696, 702 (2006) ("Although left to the states, the [*Atkins* ] procedures developed must comport with the [U.S.] Constitution.").

### a. Choice of Factfinder

Initially, we find no support for the proposition that either the U.S. or Pennsylvania Constitution mandates a bench decision of an *Atkins* issue at trial. Generally, both Constitutions speak of a criminal defendant's right to a jury; neither speaks of any right to a bench decision or to a choice of factfinder, other than a jury. *See* U.S. CONST. Art. III, § 2, Cl. 3 ("The Trial of all Crimes ... shall be by Jury"), amend. VI (trial in all criminal prosecutions "by an impartial jury"); PA. CONST. Art. I, § 9 ("[i]n all criminal prosecutions the accused hath a right to ... trial by an impartial jury"). If a right to a bench trial had been intended by the drafters of the U.S. and Pennsylvania Constitutions, it would certainly have been plainly addressed, in a similar manner as the right to a jury is addressed in both Constitutions. *See, e.g., Singer*, 380 U.S. at 28–29, 85 S.Ct. 783 (citing first constitution of Massachusetts, which provided that, in criminal cases, "it shall be the liberty of the plaintiff and defendant, by mutual consent, to choose whether they will be tried by the Bench or by a Jury"). The

U.S. Supreme Court confirmed this interpretation in *Singer*, *supra*. The High Court held that "there is no federally recognized right to a criminal trial before a judge sitting alone" nor "the right to choose between court and jury trial." 380 U.S. at 26, 34, 85 S.Ct. 783 (citing U.S. CONST. Art. III, § 2, Cl. 3, amend. VI). The *Singer* Court thus rejected the criminal defendant's "bald proposition that to compel a defendant in a criminal case to undergo a jury trial against his will is contrary to his right to a fair trial or to due process," in light of the federal Constitution's emphasis on the jury trial. *Id.* at 36, 85 S.Ct. 783.

Similarly, the Pennsylvania Constitution emphasizes the right to a jury trial. *See* PA. CONST. Art. I, § 9, *supra*. No support can be derived from that plain language for any right of the accused to a bench trial or to a choice between judge and jury. This conclusion is also supported by the constitutional provision which guarantees the Commonwealth's right to trial by jury. *See* PA. CONST. Art. I, § 6 ("the Commonwealth shall have the same right to trial by jury as does the accused"). Thus, a criminal defendant's practical ability to waive a jury trial in Pennsylvania is proscribed by the Commonwealth's competing constitutional right to a jury trial. Trial by an impartial jury is the only right guaranteed by both Constitutions, and a criminal defendant may obtain a bench trial only by **waiving** the right to a jury—in Pennsylvania, with the consent of the Commonwealth and the approval of the court. *See* Pa.R.Crim.P. 620, 621. There is "no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him." *Singer*, 380 U.S. at 36, 85 S.Ct. 783. Accordingly, we conclude that appellant has no cognizable right either to a bench trial or to a choice of factfinder, other than a jury, under the U.S. and Pennsylvania Constitutions.

██ Of course, the constitutional provisions speak to trial by jury, and an *Atkins* issue is a part of trial. But, this fact is of no constitutional significance. There is no support for appellant's argument that a pre-trial bench decision on mental capacity issues is constitutionally preferred, just as there is no current authority supporting the countervailing view that a jury decision is constitutionally-mandated. *See Bracey, supra; accord State v. Turner*, 936 So.2d 89, 98 (La.2006) ("[N]othing in the [U.S.] Supreme Court's jurisprudence suggests that requiring the jury rather than the court to decide whether the defendant has established mental retardation violates Due Process or the Eighth Amendment."). The U.S. and Pennsylvania Constitutions identify, however, trial by jury as "the **normal and preferable** mode of disposing of issues of fact in criminal cases." *U.S. v. Goodwin*, 457 U.S. 368, 383 n. 18, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) (emphasis added) (citing *Patton v. U.S.*, 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930), *abrogated on other grounds by Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)); *see* U.S. Const. Art. III, § 2, Cl. 3, amend. VI; Pa. Const. Art. I, §§ 6, 9. Any disputed *Atkins* claim will include necessarily issues of fact.[14]

In the face of these provisions, appellant turns to arguments of policy. He asserts that logic dictates that "lay persons in the jury" should not be "entrust[ed] [with] such complex determinations" as required to decide a claim of *Atkins* mental retardation. Appellant expresses doubt that the General Assembly "would enact statutes" allowing inexperienced jurors,

14. From this perspective, we respectfully view Madame Justice Orie Melvin's discussion of *Apprendi, Ring,* and *Schriro v. Smith* as inapt. *See* Concurring/Dissenting Op. at 93–95, 36 A.3d at 81–82. Simply because a jury is not constitutionally required to decide an *Atkins* claim does not mean that a jury is not a better or more appropriate factfinder. As *Bracey* recognized, the role of the jury in the *Atkins* context has not yet been decided by the U.S. Supreme Court. *See Bracey,* 986 A.2d at 142–43. In Pennsylvania, capital defendants have expressed different views: some, like appellant, argue for a non-jury disposition as a matter of right; others, like Bracey, have argued that an *Atkins* claim must be decided by a jury, as a matter of policy, if not as a matter of right. The dissent's approach to *Atkins* adjudications, however, affords no flexibility for either the criminal defendant or the Commonwealth.

"who are likely to get lost," to make decisions "involving medical conditions such as mental retardation, insanity and/or the competency" of an accused. Appellant's Brief at 14. But, given the constitutional presumption in favor of juries, the General Assembly need not enact legislation for the *Atkins* decision to fall to the jury. Rather, legislative action would be required to indicate a counter-policy, and any such legislation would have to wrestle with the prospect that a capital defendant differently disposed than appellant might claim, as Bracey did on collateral attack, a right to a jury to determine the *Atkins* claim at trial. Moreover, as a policy matter, the fact remains that juries routinely make decisions involving medical and mental conditions, guided by expert witnesses when necessary, appropriate instructions, and competent advocacy. Appellant's presumptions regarding the abilities of jurors are not supported or logical.

 Jurors neither diagnose the accused nor scrutinize the law, they make credibility determinations based on the testimony at trial of witnesses (including experts), and they render verdicts based on the trial court's instructions on the law. The courts routinely trust jurors to make such difficult determinations in the most complex of cases across fields of medicine, finance, engineering, etc., and to make findings of fact "under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts . . . ." *Patton,* 281 U.S. at 289, 50 S.Ct. 253. To take appellant's examples, in Pennsylvania, the factfinder at trial—oftentimes a jury—decides whether the accused has met his burden to prove an insanity defense, pursuant to statute. 18 Pa.C.S. § 315; *see, e.g., Commonwealth v. Smith,* 17 A.3d 873, 900–01 (Pa.2011). The issue of competency may be decided by the court, *see* 50 P.S. §§ 7402(d), 7403(a), but contrary to appellant's argument, the General Assembly has not expressed a preference to submit mental health-related factual questions to either judge or jury, generally; and, as noted, it has not addressed *Atkins* at all.[15] In short, there is no support in law or policy for the

15. Madame Justice Orie Melvin asserts that "determining whether a defendant has mental retardation is akin to determining whether a

notion of a "right" to have a judicial factfinder determine an *Atkins* question at trial.

## b. Timing of Adjudication

With respect to the timing of the *Atkins* adjudication, appellant claims that the lower court's refusal to make a pre-trial bench determination exposed him to trial before a death-

defendant is competent to stand trial," and should be resolved similarly, via a pre-trial bench decision. Concurring/Dissenting Op. at 90–93, 36 A.3d at 79–81. The concurrence conflates the separate questions of competency to stand trial and of competency to be executed, by citing both to *Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891 (1997) (competency to stand trial) and to *Commonwealth v. Banks*, 29 A.3d 1129 (Pa.2011) (competency to be executed). Although all three inquiries concern the mental capacity of a criminal defendant, they implicate the protection of distinct constitutional interests and different procedural concerns. Most obviously, competency to be executed is an Eighth Amendment concern; the adjudicatory process is clearly inapposite because it takes place after trial and after judgment is final. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

The distinction regarding the competency to stand trial decision process is that it was created by the General Assembly, not by this Court. *See* 50 P.S. §§ 7402(d), 7403(a). Moreover, inquiries into a defendant's competency to stand trial and an accused's mental retardation are fundamentally dissimilar. A competency inquiry is driven by Fourteenth Amendment due process concerns regarding a defendant's ability to understand criminal charges and proceedings, and to consult counsel, so as to ensure the ability to manage a meaningful defense. *See Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Criminal proceedings for an incompetent defendant are stayed until the defendant is found competent. The salient constitutional interests for devising an adequate process are fairness and sound judicial administration, including a recognition of inherent difficulties with a *nunc pro tunc* competency decision, especially since competency can change over time. *Id.* at 178 n. 13, 183, 95 S.Ct. 896 ("resolution of the issue of competence to stand trial at an early date best serves both the interests of fairness and of sound judicial administration"). Postponing an entire proceeding has an obvious advantage over piece-meal litigation in these respects. By contrast, the High Court's *Atkins* decision was grounded in the Eighth Amendment prohibition against cruel and unusual punishment and concerns regarding, *inter alia*, culpability of mentally retarded capital defendants. *See Atkins*, 536 U.S. at 321, 122 S.Ct. 2242 ("death is not a suitable punishment for a mentally retarded criminal"). Generally, assessments of culpability, unlike procedural fairness, are for the trier of fact—the jury or the trial judge, if the right to a jury is waived. The mental retardation inquiry is not insulary or limited to the time of the relevant proceeding, as the capital defendant must establish onset of mental retardation before age 18 to claim death-penalty disqualification.

qualified jury, which affected his jury-selection and trial strategy, forced him to forego testifying in his own defense, and permitted introduction into evidence of otherwise impermissible aggravators. According to appellant, had the court made a pre-trial adjudication in his favor, his jury pool and the jury would have been composed differently, and any of the new members of the jury could have affected the verdict. Also, he speculates the jury could have included two additional African–American jurors, which may have given him additional *Batson* challenges if the Commonwealth had struck those jurors, and/or strengthened his *Batson* challenge regarding venire person # 34, discussed *supra.* In the alternative, if the trial court had rejected his *Atkins* claim pre-trial, appellant states that he "may have taken the stand in his own defense ... since he had nothing to lose at that point." Appellant theorizes that, where the *Atkins* decision is deferred until after the guilt phase, the defendant's choice of whether to testify on his own behalf is burdened because an accused who "does well in his trial testimony ... risks undermining his *Atkins* claim by appearing to be more competent than he really is. Or, he incurs the opposite risk of having his otherwise credible testimony dismissed as inaccurate by the jury, who is now called upon to determine the severity of his mental retardation." Appellant concludes that his rights under the Fifth, Sixth, and Fourteenth Amendments were thereby violated. Appellant also asserts that "[t]here is an inherent prejudice and stigma associated with advising the jury that the Commonwealth is seeking a sentence of death." Appellant's Brief at 14–15.

The U.S. and Pennsylvania Constitutions guarantee a criminal defendant trial "by an impartial jury" and "due process of law," as safeguards of "the fundamental elements of fairness in a criminal trial." U.S. CONST. amends. VI, XIV; *Rivera v. Illinois,* 556 U.S. 148, 129 S.Ct. 1446, 1454, 173 L.Ed.2d 320 (2009) (*per curiam*); PA. CONST. Art. I, § 9. A death-qualified jury generally comports with constitutional requirements. *Witherspoon v. Illinois,* 391 U.S. 510, 517–18, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (death-qualified jury is

not *per se* unconstitutional); *see Lockhart v. McCree*, 476 U.S. 162, 174–84, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (rejecting arguments that death-qualification of jury violates "impartial jury" and "fair cross-section" clauses of Sixth Amendment); *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74, 87 (1987) (rejecting federal and state constitutional arguments in favor of separate juries for guilt and penalty phases). According to the *Witherspoon* Court, absent evidence to the contrary relating to a specific jury, the exclusion of jurors opposed to capital punishment neither "results in an unrepresentative jury on the issue of guilt[, n]or substantially increases the risk of conviction." 391 U.S. at 518, 88 S.Ct. 1770; *see Lockhart*, 476 U.S. at 177–84, 106 S.Ct. 1758; *Jermyn*, 533 A.2d at 87; *Commonwealth v. Wilson*, 431 Pa. 21, 244 A.2d 734, 739 (1968), *cert. denied*, 393 U.S. 1102, 89 S.Ct. 901, 21 L.Ed.2d 794(1969). Thus, the mere fact of deferring the *Atkins* decision to a death-qualified jury in a capital trial does not violate any existing constitutional proscription.

 Moreover, appellant does not adduce any evidence that his particular jury was biased. Rather, he simply claims "inherent prejudice" and asserts that his rights were violated because he was "forced" into making less attractive strategic choices, such as selecting a jury from a death-qualified pool with only one African–American venire person, rather than from a general pool with three African–American venire persons. He speculates that a different jury composition, and a greater number of minority jurors on his jury, would have given him an improved chance of success at trial. But, even setting aside the speculative nature of this argument, the U.S. Constitution guarantees a fair trial before an impartial jury, not a trial before what a party perceives as a favorable jury. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). A criminal defendant is also "not entitled to the services of any particular juror but only as to twelve unprejudiced jurors." *Commonwealth v. Wallace*, 555 Pa. 397, 724 A.2d 916, 922 (1999); *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 70 (1994). Moreover, the accused has no

right to demand that specific minority groups or even members of his own race be included in his jury. And, it should be remembered that the constitutional right recognized in *Batson* belongs to prospective jurors intentionally denied participation in jury service based upon race and not to the criminal defendant any more than to the Commonwealth. *Harris, supra,* 817 A.2d at 1042–43; *Powers, supra,* 499 U.S. at 415–16, 111 S.Ct. 1364. In light of these principles, appellant's argument that deferral of the *Atkins* decision violated his due process or *Batson* rights fails. As the U.S. Supreme Court has stated, a "procedure does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar." *Leland v. Oregon,* 343 U.S. 790, 799, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); *see also Patterson v. New York,* 432 U.S. 197, 208, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) ("Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."). A procedure also does not raise due process concerns simply because the accused believes that another method would improve his chances for acquittal. *Medina, supra,* 505 U.S. at 451, 112 S.Ct. 2572 ("The Due Process Clause does not ... require a State to adopt one procedure over another on the basis that it may produce results more favorable to the accused.").

■ Appellant's claim that his Fifth Amendment rights were violated in this scenario similarly fails. In relevant part, the Fifth Amendment protects a criminal defendant's right against self-incrimination. The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV; *accord* Pa. Const. Art. I, § 9 (accused "cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land"). Here, appellant claims that he was "forced" by the trial court's decision to forego testifying at trial on his own behalf. But, again, the "ability to waive [a] constitutional right does not ordinarily

carry with it the right to insist upon the opposite of that right." *Singer*, 380 U.S. at 34–35, 85 S.Ct. 783. Appellant's ability to testify at trial by waiving his Fifth Amendment right against self-incrimination does not implicitly create a constitutional "right" to testify on one's own preferred terms at trial. Moreover, the trial court's decision here did not compel appellant to do anything. Appellant's testimony was neither compelled nor precluded; rather, appellant exercised his constitutional right not to testify (whether he would have incriminated himself or not).

Here, appellant forwards no compelling argument, nor do we see any reason, to deviate from the well-established principles of constitutional law governing the claims at issue in this appeal. Additionally, the present record does not reveal any cognizable prejudice arising from the trial court's decision to permit a death-qualified jury's adjudication of appellant's *Atkins* claim at the penalty phase. For these reasons, we reject appellant's allegations of various *per se* constitutional violations as meritless. Appellant's arguments do not identify any basis in law mandating a pre-trial, bench determination of *Atkins* claims.[16]

### c. Other Considerations: Atkins Procedures in Other States

As the above discussion reveals, there is no merit in appellant's claim that the timing of an *Atkins* adjudication or the

16. Justice Orie Melvin "find[s] no reason to prohibit the judge from making an *Atkins* decision prior to trial" and expresses a preference for requiring such an approach, premised largely on policy concerns. The concurrence emphasizes alleged time and cost savings of avoiding a capital trial. Concurring/Dissenting Op. at 96, 36 A.3d at 81–82. Of course, the approach the Court adopts today recognizes that resolution by a judge can be appropriate, if the parties agree. Respecting the concurrence's preference to adopt a policy-based requirement of pre-trial bench disposition, we would note that the policy-making branch, the General Assembly, has not been able to agree on the appropriate policy, including the timing of the *Atkins* adjudication and the identity of the finder of fact. *See, e.g.*, S.B. 397, 2011–12 Gen. Assem., Reg. Sess. (Pa.2011); S.B. 628, 2009–10 Gen. Assem., Reg. Sess. (Pa.2009). In short, it is not readily apparent what the appropriate policy should be, if policy were the driving force. We would leave to the General Assembly any policy-based recalibration of *Atkins* implementation.

identity of the *Atkins* factfinder is constrained by any existing precepts of constitutional law. The *Atkins* Court likewise left the implementation of its new constitutional rule to the various states with no particular restraints attached. *Accord Turner, supra,* 936 So.2d at 99 ("Neither *Atkins* nor other controlling legal principles compel the selection of a specific fact finder regarding mental retardation or require the determination be made at a specific point in the adjudication process."). For further insight into the proper manner of implementation, faced with the continuing inaction of the General Assembly, we will turn to a consideration of the approach of our sister states regarding *Atkins* adjudications.[17] What follows is a summary of the information detailed in the appended table.

Among our sister states, thirty-two have devised *Atkins* procedures either by legislative or judicial action. In twenty-two of those jurisdictions, judges act as the primary finders of fact and adjudicators of mental retardation claims. *See Morrow v. State,* 928 So.2d 315 (Ala.Crim.App.2004) (Alabama rule governing post-conviction procedure to act as interim guidance for adjudicating *Atkins* claims until state legislature acts); Ariz.Rev.Stat. § 13–753 (2001); Ark.Code § 5–4–618 (1993); Colo.Rev.Stat. § 18–1.3–1102 (2002); 11 Del.Code § 4209 (2002); Fla. Stat. § 921.137 (2001); Idaho Code § 19–2515A (2003); Ind.Code 35–36–9–5 (1994); Kan. Stat. § 21–6622 (2011); Ky.Rev.Stat. § 532.135 (1990); *Chase v. State,* 873 So.2d 1013 (Miss.2004); Neb.Rev.Stat. § 28–105.01 (1998); Nev.Rev.Stat. 174.098 (2003); *State v. Flores,* 135 N.M. 759, 93

**17.** Our discussion and table includes two states (New Jersey and New Mexico), which recently abolished the death penalty and a third state (New York) whose death penalty statute was found to be unconstitutional, but all three had established *Atkins* procedures prior to abolition. Although the procedures in these states may be moot, they are nonetheless instructive. Excluded from discussion are the twelve states (Alaska, Hawaii, Illinois, Iowa, Maine, Massachusetts, Michigan, Minnesota, North Dakota, Rhode Island, West Virginia, and Wisconsin) that have neither a death penalty statute nor an *Atkins* procedure. Additionally, five other states are excluded from this analysis because, although they have statutes that currently permit the imposition of the death penalty for either murder (Montana, New Hampshire, Oregon, and Wyoming) or treason (Vermont), they have yet to devise an *Atkins* procedure. Pennsylvania is, of course, also excluded.

P.3d 1264 (2004); N.Y.Crim. Proc. Law § 400.27 (1995); *State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011 (2002); 21 Okla. Stat. § 701.10b (2006); *Franklin v. Maynard,* 356 S.C. 276, 588 S.E.2d 604 (S.C.2003); S.C.Code § 16–3–20 (1992); S.D. Codified Laws § 23A–27A–26.3 (2000); Tenn.Code § 39–13–203 (1990); Utah Code § 77–15a–104 (2003); Wash. Rev.Code § 10.95.030 (1993). But, many of these same states recognize a role for the jury as factfinder. Thus, in the event of a bench decision adverse to the capital defendant, nine states (Arizona, Arkansas, Delaware, New Mexico, Oklahoma, South Carolina, South Dakota, Tennessee, and Utah) permit the defendant to submit the issue of mental retardation to the jury, either as a conclusive bar to the death penalty or as one potential mitigator to be weighed against aggravators. *Cf. Bracey,* 986 A.2d at 133 n. 4 (mental retardation for purposes of *Atkins* is discrete issue from mental retardation as one mitigator to be weighed against aggravators) (quoting *Bobby v. Bies,* 556 U.S. 825, 129 S.Ct. 2145, 2149, 173 L.Ed.2d 1173 (2009)).

On the other hand, in nine states, the primary adjudicator of an *Atkins* claim is the trier of fact, *i.e.,* the jury, or the trial judge if the right to a jury is waived. *See* Cal.Penal Code § 1376 (2003); Conn. Gen.Stat. § 53a–46a (2001); *State v. Rizzo,* 266 Conn. 171, 833 A.2d 363, 376 & n. 5 (2003); Ga.Code § 17–7–131 (1988); La.Code Crim. Proc. art. 905.5.1 (2003); Md.Code, Criminal Law, §§ 2–202, 2–303 (2002); Md. Rules, Rule 4–343 (2009); Mo. Stat. § 565.030 (2001); *State v. Jimenez,* 188 N.J. 390, 908 A.2d 181 (2006) (establishing guidelines but referring to procedural rules committee); N.C. Gen.Stat. § 15A–2005 (2001); Va.Code § 19.2–264.3:1.1 (2003).[18] In Louisiana, Missouri, and North Carolina, the parties may agree to forgo a jury decision and submit the *Atkins* claim to the trial judge. In both Missouri and North Carolina, however, the defendant may again present the men-

18. In Texas, the Criminal Appellate Court has found no error with submitting an *Atkins* claim to the jury at the penalty phase. But, the state has not yet established a required procedure for adjudicating mental retardation claims. *See Williams v. State,* 270 S.W.3d 112 (Tex.Crim.App.2008); *Gallo v. State,* 239 S.W.3d 757 (Tex.Crim.App. 2007).

tal retardation evidence to the jury (at the penalty phase) in case of a bench ruling adverse to the defendant. By comparison, in California, the accused waives the right to a jury *Atkins* adjudication by requesting a bench decision. Prior to the abolishment of the death penalty in 2007, New Jersey also referred mental retardation decisions primarily to the jury, albeit if "reasonable minds [could] not differ as to the existence of retardation," a judge would decide the *Atkins* claim pre-trial. Mental retardation evidence could also be introduced to negate an element of the crime or in mitigation, at the penalty phase. Similarly, under the New York statutory scheme, the defendant could apply for a bench determination if the court had "reasonable cause" to believe he was mentally retarded and exempt from the death penalty.

Fourteen states (Arizona, Arkansas, Colorado, Idaho, Indiana, Kentucky, Mississippi, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, and Utah) require pre-trial determinations of *Atkins* claims, while eight states (Connecticut, Delaware, Florida, Louisiana, Maryland, Missouri, Virginia, and Washington) require decision at the penalty phase. The schemes in Alabama and New Mexico permit criminal defendants to raise an *Atkins* claim at any time during trial. The procedure of four states (California, Kansas, New Jersey, and North Carolina) provides for adjudication of mental retardation after the guilt phase but before deliberations on aggravators and mitigators at the penalty phase. Nebraska and New York would defer decision on *Atkins* claims until after the penalty phase, with New York judges reaching the issue of mental retardation only if the defendant is condemned to death. The procedures in both New Jersey and New York contemplated that the decision may be made before trial if "reasonable minds cannot differ as to the existence of mental retardation" or if the court has "reasonable cause" to believe that the criminal defendant is mentally retarded. Georgia stands out as the only state to require a decision during the guilt phase of trial, as the jury may enter a verdict of "guilty but mentally retarded."

In most states, bench decisions are made before trial, while jury determinations are assigned to the penalty phase. But, jurisdictions are almost equally divided on whether the *Atkins* adjudication is made before or after the trier of fact has heard the evidence at trial. Thus, in fifteen of the twenty-two states in which judges are the primary adjudicators, the *Atkins* determination is either made before trial, or as soon as possible and preferably before trial (Alabama). With the exception of Georgia, the remaining sixteen states deferred decision until after the conclusion of the guilt phase, whether the decision was made by judge or jury. This survey corroborates what we have already determined upon examination of appellant's argument: his preferred method of adjudicating an *Atkins* claim is not constitutionally required. As revealed by the varied approaches of the states, in the wake of *Atkins*, no particular path is mandated, nor preferred.

### d. Decision of Appellant's Claim

Against this background, we find that the trial court committed no error in deferring the *Atkins* decision to a jury for a penalty phase decision. This is particularly so given that appellant waited until the day of trial to forward his claim. Appellant notified the Commonwealth and the trial court of his *Atkins* claim and requested the pre-trial bench hearing on February 23, 2009, the first day of *voir dire. See* N.T., 2/23/09, at 12–21, 140–52. Moreover, appellant was not ready to proceed on the claim: he did not present a psychiatric expert report and stated that the report would not become available until February 25, 2009. The Commonwealth objected to a pre-trial hearing on the basis that it had no notice and no opportunity to investigate and prepare a report on appellant's *Atkins* claim. Further, the court noted that a postponement of trial would have been a financial burden on the Commonwealth, which had already arranged for the presence of witnesses at the trial scheduled to commence March 1, 2009. The court was not persuaded by appellant's argument that the Commonwealth should have known of a potential *Atkins* claim since the fall of 2008, when appellant secured funding for a

mitigation expert. The court noted that an *Atkins* claim is not akin to mitigation evidence and, while the Commonwealth may have had notice that appellant sought to introduce mitigation evidence, it had no notice that appellant was claiming death-ineligibility under *Atkins.*

The record supports the trial court's conclusion that the Commonwealth was not notified until the morning of *voir dire* and that postponing trial would have been burdensome on the Commonwealth, which had not caused the delay. As we explained above, no law, constitutional or otherwise, entitled appellant to a different manner of decision. And, even if there were some colorable basis for appellant's claim of a "right" to a pre-trial bench determination of an *Atkins* claim in the abstract, the trial court would have been warranted in denying the request under these circumstances.

### e. Adoption of a Procedure for the Determination of Atkins Claims at Trial

#### 1. Factfinder and Timing of Atkins Adjudication

Nine years have elapsed since *Atkins* was decided, and the General Assembly has not yet adopted measures for implementation of the constitutional restriction on the execution of mentally retarded capital offenders. The void has already led this Court to address the substantive standard for assessing *Atkins* mental retardation, *see Miller,* 888 A.2d at 629–31, as well as the appropriate manner to address post-conviction claims sounding in *Atkins. See Bracey,* 986 A.2d at 134: *Miller,* 888 A.2d at 629 n. 5. While the *Atkins* decision in this matter is relatively straightforward, the case has provided an opportunity for a comprehensive consideration of the constitutional parameters of *Atkins* review, informed by the approaches of other states in implementing *Atkins.* Although no particular procedure for implementation of *Atkins* has been constitutionally commanded by the U.S. Supreme Court, the prospect of different standards and manners of implementation in capital cases within a single state is no longer tolerable. Accordingly, this Court will take this occasion to establish procedures for the implementation of *Atkins* at the trial level.

Because there are no substantive constitutional restrictions upon implementation of procedures to decide *Atkins* claims, the procedures we announce below are a proper exercise of our constitutional authority over judicial administration. *See* PA. CONST. Art. V, § 10(c).

After considering the arguments raised by the parties here, the centrality of the right to a jury in our constitutional system, concerns of judicial economy and administrative efficiency, as well as the experience of other states, we approve of the procedure that the trial court used in this case—*i.e.*, submitting a colorable *Atkins* issue to the jury for a penalty phase decision.[19] We also agree with the trial court's determination, as reflected in its charge, that: (1) the burden is on the proponent of the *Atkins* claim, usually the defendant, to prove mental retardation by a preponderance of the evidence; (2) a finding of mental retardation, for purposes of death ineligibility under *Atkins*, must be unanimous; (3) and the jury should pass upon the *Atkins* mental retardation question before proceeding to consider the aggravators and mitigators, a consideration that will occur only if the defendant fails to carry his burden.[20]

**19.** Of course, an *Atkins* claim is not properly for the factfinder unless there is competent evidence to support the claim, under the standard announced in *Miller*.

**20.** Judge Madenspacher offered the following jury instruction respecting the *Atkins* question:

Members of the jury, . . . the first thing that you're going to have to determine before you go on to this balancing that [counsel] talked about is whether or not the defendant is mentally retarded. And in this case, there is an issue of whether the defendant is or is not mentally retarded.

And the reason you have to decide this is because the United States Supreme Court in the famous case of Atkins versus Virginia . . . they've ruled that the execution of mentally retarded persons violates the 8th Amendment[, the] [p]rohibition against [c]ruel and [u]nusual [p]unishment.

Consequently, the first thing that you must decide is on the issue of whether the defendant is or is not mentally retarded.

In order to find that the defendant is mentally retarded, he must prove to you by a preponderance of the evidence the following:

Number one, he possesses limited intellectual functioning, meaning that his IQ score is approximately two standard deviations, which is

 Our reasons for approving decision by the jury at the penalty phase have already been discussed: we view the centrality of the jury in our constitutional system to weigh

> 30 points, below the mean, which is 100, with a standard error of measurement of three to five points.
>
> Number two, that his adaptive behavior as expressed in conceptual, social and practical skills is significantly limited.
>
> And, number three, the age of onset was before age 18.
>
> \* \* \*
>
> And I'll address this to all the jurors, and particularly to the foreperson. The same foreperson will deal with the sentencing.
>
> It's what I call a mental retardation verdict slip. And it starts off basically simply [as] this: Do you unanimously find, by a preponderance of the evidence, that the defendant is mentally retarded or is not mentally retarded?
>
> If you unanimously agree, check the appropriate line.
>
> And this is relatively simple. The first one will say, we, the jury, unanimously find by a preponderance of the evidence that the defendant is mentally retarded.
>
> And then after that, I'll tell you what happens. If you check this line, the defendant cannot receive the death penalty. Return to the courtroom and the [c]ourt will impose a sentence of life imprisonment without parole.
>
> Second possible block is, we, the jury, unanimously find, by a preponderance of the evidence, that the defendant is not mentally retarded. Okay?
>
> And if you check that block, the one after that says, if you check this line, then proceed to the first degree murder sentencing verdict slip; in other words, we start into the [aggravating circumstances/mitigating circumstances] deliberations that everybody's talked about.
>
> \* \* \*
>
> You may not direct the deliberations toward the death penalty balancing until the decision of the mental retardation has been made.
>
> If you unanimously find the defendant is not mentally retarded, you must then decide what to impose upon the defendant, what sentence to impose upon the defendant. And your sentence will depend on what you find about aggravating and mitigating circumstances.

N.T., 3/11/09, 2821–24. We do not endorse the particulars of this jury instruction, as appellant does not develop any related claims, *see infra*, but reproduce it for illustrative purposes.

As we explain in the text, we explicitly approve of the instruction insofar as it: (1) directs the jury to pass upon death eligibility under *Atkins* before proceeding to consider aggravators and mitigators only if the *Atkins* claim is rejected; and (2) places the burden on the proponent of the *Atkins* claim to prove mental retardation by a preponderance of the evidence. There are aspects of the charge and verdict slip which obviously are problematic, such as the suggestion in the verdict slip that the jury had to unanimously find by a preponderance of the evidence that the defendant was either mentally retarded or was not mentally retarded.

heavily in favor of reposing the determination with the jury. Indeed, in the context of a preserved *Atkins* claim at the trial level, *contrast Bracey, supra,* it is not clear that commanding a bench decision would comport with the constitutional right to a jury. Having said that, nothing in the procedure we approve impedes the right of the parties to agree to waive a jury and ask the trial court to decide the *Atkins* claim.[21] Where such a waiver and bench *Atkins* determination occurs, however, the *Atkins* claim cannot be renewed before the jury, except insofar as evidence respecting the defendant's mental state is properly proffered in support of a statutory mitigator, in cases where a waiver judge rejects the *Atkins* claim. *See infra.* In other words, in the absence of such a policy directive from our General Assembly, we discern no ground upon which to follow those states which allow the defendant two opportunities for a favorable *Atkins* outcome by different factfinders. Where the *Atkins* claim is decided by the court in a waiver proceeding, that determination is conclusive, subject of course to appropriate post-verdict and appellate review. In cases of requested jury waiver, any agreement must be presented to the court for approval in sufficient advance as not to delay or disrupt the trial proceedings, at the discretion of the trial judge.

Furthermore, we agree with those states which have concluded that, if the factfinder (whether the jury or the judge, in cases of jury waiver) rejects the *Atkins* claim, proper evidence respecting alleged mental retardation may still be presented and argued to the jury if it supports a statutory mitigating circumstance. As a mitigator, mental retardation is less than a death penalty disqualifier and requires weighing

21. We recognize the force of Justice Orie Melvin's suggestion that the parameters of *Atkins* claim notice requirements must also be defined. *See* Concurring/Dissenting Op. at 87–93, 36 A.3d at 77–80. However, we do not deem it necessary to establish through decisional law the strict procedure proposed by the concurrence or to anticipate the waiver consequences. We do not dispute that pre-trial notice should be required, but also realize that there may be reasons why counsel would not recognize the viability of an *Atkins* claim until later in the trial preparation stage. We will refer the task of devising the notice procedure to the expertise of our Criminal Procedural Rules Committee, to consider the appropriate timing of the claim notice, while providing sufficient flexibility for good cause shown.

by the jury with other mitigators, if any, against any aggravators. 42 Pa.C.S. § 9711(c); *see Bobby, supra,* 129 S.Ct. at 2149 (*Atkins* claim distinct from offer of mental retardation evidence in mitigation). And finally, our approval of the progression aspect of the court's charge—*i.e.,* directing the penalty phase jury to pass upon *Atkins* first—is consistent with the High Court's command that a person found to be mentally retarded is ineligible for the death penalty.

## 2. *Burden of Proof on Defendant by Preponderance*

In approving the placement of the burden of proof on the defendant by a preponderance of the evidence, we underscore that "it is normally within the power of the [s]tate to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion." *Patterson, supra,* 432 U.S. at 201–02, 97 S.Ct. 2319; *accord Schriro v. Smith,* 546 U.S. at 7–8, 126 S.Ct. 7 (state *Atkins* procedures may, "in their application, be subject to constitutional challenge," but state must first have opportunity to apply them). Consistent with this principle, the *Atkins* Court refrained from assigning the burden of proving mental retardation at trial, and left it to the states to implement the broad federal mandate against execution of the mentally retarded. *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242 (citing *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). Having surveyed the national landscape in discerning a trending consensus against capital punishment of the mentally retarded, the *Atkins* Court was certainly aware that states which prohibited such executions at the time of the *Atkins* decision had already established procedures and "had drawn in different places the line for establishing the mental retardation that would bar execution," reflecting a "disagree[ment among jurisdictions] over which individuals in fact have mental retardation." *Grell,* 135 P.3d at 705 & 703 n. 7;[22] *see Atkins,*

22. Of the states with a procedure for determining mental retardation at the time of the *Atkins* decision, twelve required proof by a preponderance of the evidence, five states by clear and convincing evidence, and one state (Georgia, the very first state to exempt the mentally retarded from execution) by proof beyond a reasonable doubt. Since *Atkins,* the

536 U.S. at 317, 122 S.Ct. 2242 ("To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded."). Nonetheless, the Court neither mandated, nor indicated a preference, for any particular attribution of the burden of proof.

As the High Court has explained, "[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Cooper v. Oklahoma*, 517 U.S. 348, 362, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (quoting *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). While the risk of error in a particular adjudication does not vary depending on the standard of proof adopted, the burden allocates that risk between the parties. *Id.* at 366, 116 S.Ct. 1373. A more stringent burden of proof imposes on a party a higher risk of an erroneous decision. *Id.* at 362–63, 116 S.Ct. 1373. In a criminal proceeding, an allocation of risk complies with due process "unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson*, 432 U.S. at 202, 97 S.Ct. 2319; *Medina*, 505 U.S. at 446, 112 S.Ct. 2572. Generally, in examining state burdens of proof, the High Court gives "substantial deference" to procedures grounded in the common law tradition, weighs their impact on "any recognized principle of fundamental fairness in operation" and, to a lesser extent, gives consideration to contemporary practice. *Id.* at 445–48, 112 S.Ct. 2572.

The categorical exemption of mentally retarded individuals from the death penalty is a relatively new concept, part of "evolving standards of decency" recognized by the High Court

Supreme Court of Indiana has declared that state's provision requiring proof by clear and convincing evidence unconstitutional, and adopted a preponderance of the evidence standard. *Pruitt v. State,* 834 N.E.2d 90, 102 (Ind.2005).

in the *Atkins* decision, rather than a concept long-rooted in the common law tradition. *Atkins*, 536 U.S. at 312, 122 S.Ct. 2242. In this Commonwealth, which, unlike the states from which the *Atkins* Court deduced a growing consensus, did not adopt a legislative prohibition against execution of mentally retarded capital defendants, there is no historical basis for any particular allocation of the burden of proof in mental retardation adjudications, or for a prohibition against assigning that burden to the defendant. *Cf. Medina*, 505 U.S. at 448, 112 S.Ct. 2572 (discerning no historical impediment to allocating burden of proving incompetence to defendant). Absent a common law history or a policy directive from our Legislature that we should go further than what is affirmatively commanded by the High Court, we examine the decision to assign the burden of proof to the defendant by a preponderance of the evidence to determine whether this procedure violates any recognized principles of fundamental fairness. *Id.* at 445, 112 S.Ct. 2572. The analysis "looks to the operation and effect of the law as applied and enforced by the state, and to the interests of both the [s]tate and the defendant as affected by the allocation of the burden of proof." *Mullaney v. Wilbur*, 421 U.S. 684, 699, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (internal citation omitted).

Initially, we note that there is no constitutional impediment to placing the burden of production and persuasion on the accused, the proponent of the *Atkins* claim, to prove his mental retardation. It is axiomatic that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364, 90 S.Ct. 1068. But, as we explained in *Bracey*, "under the current Pennsylvania statutory scheme, a lack of mental retardation is not an element or the functional equivalent of an element of the capital sentence, since it does not relate to the facts surrounding the commission of the crime nor does it relate to the defendant's mental state at the time he committed the crime.... The statute is not written in the negative." *Bracey*, 986 A.2d at 145. An *Atkins*-style

mental retardation adjudication, for purposes of death ineligibility, is an intrusion upon the capital penalty scheme designed by the General Assembly. The *Atkins* adjudication, therefore, is not logically a part of the necessary burden of proof on the Commonwealth.

Moreover, although the *Atkins* decision recognizes a constitutional right, once a state provides the accused access to procedures for making a mental retardation evaluation, there is no due process requirement that the Commonwealth prove a negative, and assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is not mentally retarded and is eligible for execution. *See Medina*, 505 U.S. at 449, 112 S.Ct. 2572 (burden on criminal defendant of proving incompetency is constitutional). This is consistent with the traditional understanding of due process, which requires "that only the most basic procedural safeguards be observed." *Id.* at 453, 112 S.Ct. 2572. A "reasonable opportunity" to prove mental retardation is sufficient to meet this standard. *Id.* at 451, 112 S.Ct. 2572.

Assigning the burden of proof to the *Atkins* defendant is consistent with these proscriptions and with the treatment of affirmative defenses generally. At common law, the burden of proving affirmative defenses, or "all circumstances of justification, excuse or alleviation[,] rested with the defendant." *Patterson*, 432 U.S. at 202, 97 S.Ct. 2319. Indeed, "[t]he decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant." *Id.* at 203 n. 9, 97 S.Ct. 2319 (quoting *Morrison v. California*, 291 U.S. 82, 88–89, 54 S.Ct. 281, 78 L.Ed. 664 (1934)). The constitutional genesis of an affirmative defense, like the categorical exemption of mentally retarded individuals from execution under the Eight Amendment, does not suggest or mandate an alteration to this approach. *See Medina*, 505 U.S. at 451, 112 S.Ct. 2572.

Notably, in *Medina*, the Supreme Court rejected the criminal defendant's argument that the burden of proof in a compe-

tency hearing should be allocated to the state because his constitutional rights were implicated. *Medina*, 505 U.S. at 451–52, 112 S.Ct. 2572 (distinguishing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (waiver of *Miranda* rights); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377, (1984) (inevitable discovery of evidence obtained by unlawful means); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (voluntariness of consent to search); *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of confession)). According to the Court, the cases cited by the defendant in support of his argument did not control the result "because they involved situations where the government sought to introduce inculpatory evidence obtained by virtue of a waiver of, or in violation of, a defendant's constitutional rights. In such circumstances, allocating the burden of proof to the government furthers the objective of deterring lawless conduct by police and prosecution." *Id.* at 452, 112 S.Ct. 2572 (internal quotes omitted). The Court concluded that different interests were at stake in a competency determination. *Id.*

The only limitation identified by the High Court, as a general matter, is "that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression." *Patterson*, 432 U.S. at 203 n. 9, 97 S.Ct. 2319 (quoting *Morrison v. California*, 291 U.S. 82, 88–89, 54 S.Ct. 281, 78 L.Ed. 664 (1934)). Justice O'Connor in concurrence further explained the relevant considerations in determining whether the placement of the burden of proof is fundamentally unfair: "whether the government has superior access to evidence; whether the defendant is capable of aiding in the garnering and evaluation of evidence on the matter to be proved; and whether placing the burden of proof on the government is necessary to help enforce a further right, such as the right to be presumed innocent, the right to be free from self-incrimina-

tion, or the right to be tried while competent." *Medina*, 505 U.S. at 455, 112 S.Ct. 2572 (O'Connor, J., concurring).

With respect to *Atkins* mental retardation determinations, the relevant considerations among these factors weigh in favor of placing the burden of proof on the capital defendant. First, the capital defendant generally has superior knowledge and access to evidence regarding his mental capabilities. In *Atkins*, the Supreme Court majority suggested that the deficiencies in understanding and processing information, communicating, learning from experience, engaging in logical reasoning, controlling impulses, and understanding others' reactions diminish the personal culpability of mentally retarded persons for criminal acts, and "undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards." *Atkins*, 536 U.S. at 317–18, 122 S.Ct. 2242. In this regard, the Court opined that the risk of wrongfully executing a mentally retarded person is enhanced by the possibility of false confessions, by lesser ability to give meaningful assistance to counsel, and by the possibility of lesser effectiveness when testifying, *i.e.*, mental retardation creating an unwarranted impression of lack of remorse, or being factored into aggravating factors, like future dangerousness. These concerns affecting relative culpability for purposes of the ultimate penalty, however, do not suggest that placing the burden of proof on the defendant in *Atkins* adjudications would be problematic. *See Medina*, 505 U.S. at 450, 112 S.Ct. 2572. As with a competency determination, if the defendant indeed has a limited ability to assist counsel, that fact "can, in and of itself constitute probative evidence" of mental retardation. *Id.* Counsel for the capital defendant is better positioned than the Commonwealth to determine the degree to which his client can participate in his defense, and to gather the evidence and witnesses relevant to an *Atkins* determination. *Id.*

Furthermore, to quote Justice O'Connor again, if the burden rested on the Commonwealth, "a defendant will have less incentive to cooperate in psychiatric investigations, because an inconclusive examination will benefit the defense, not the prosecution. A defendant may also be less cooperative in

making available friends or family who might have information about the defendant's mental state." *Medina*, 505 U.S. at 455, 112 S.Ct. 2572 (O'Connor, J., concurring); *accord Patterson*, 432 U.S. at 211 n. 13, 97 S.Ct. 2319 (quoting with approval that "placing the burden of proof on the defense, with a lower threshold, however, is fair because of defendant's knowledge or access to the evidence other than his own on the issue."). This concern is heightened in the *Atkins* context. Courts have recognized the potential to manipulate evidence regarding mental retardation. *See, e.g., Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1187–88 (2009) (test for mental retardation seeks "to ensure that defendants cannot feign mental retardation after being charged with a capital crime"); *Atkins*, 536 U.S. at 353–54, 122 S.Ct. 2242 (Scalia, J., joined by Rehnquist, C.J. and Thomas, J., dissenting) ("capital defendant who feigns mental retardation risks nothing at all"); *Commonwealth v. Birdsong*, 24 A.3d 319, 352 n. 3 (Pa.2011) (Castille, C.J., concurring); *Grell*, 135 P.3d at 702 (*Atkins* claimant "has significant motivation to attempt to score poorly on IQ test"); *Bowling v. Commonwealth*, 163 S.W.3d 361, 376 (Ky.2005) (depression, tension, anxiety, and incentive to malinger can cause IQ score of capital defendant to be "significantly skewed"). Assigning the minimum preponderance risk to the *Atkins* proponent in this context is appropriate. In short, placing the burden on the capital defendant to prove his claim of mental retardation by a preponderance of evidence would not exacerbate the concerns identified by the High Court regarding the risk of wrongful execution of mentally retarded capital defendants; nor would placing that burden on the state advance the new Eighth Amendment right in any proper fashion.

Moreover, allocating the risk to the capital defendant does not violate due process. An *Atkins* claim will be decided through procedures which ensure the capital defendant a reasonable opportunity to prove mental retardation to an impartial factfinder. Placing the burden on the defendant does not contravene any accepted standards of fairness and justice. *See, e.g., Leland*, 343 U.S. at 799, 72 S.Ct. 1002

(burden on defendant to prove insanity defense). Finally, allocating the burden to the defendant does not disturb existing measures designed in favor of life. As we recently noted, the penalty phase statutory scheme in a capital case in Pennsylvania operates to "slant the inquiry in favor of life imprisonment" rather than death, but does not create a constitutional "right to life" or the right to insist on an *Atkins* procedure that produces results more favorable to the capital defendant. *Commonwealth v. Lesko*, 15 A.3d 345, 404–05 (Pa.2011); *Medina*, 505 U.S. at 451, 112 S.Ct. 2572. After weighing these considerations, we perceive no constitutional impediment to placing on the capital defendant the burden of proving his entitlement to relief under *Atkins*. And, consistently with common law practice, the concerns discussed above, and the failure of the General Assembly to direct otherwise, we believe the better course is that the burden be placed on the *Atkins* defendant.

Respecting the degree of proof, the preponderance standard also comports with the burden usually imposed on criminal defendants. Imposing this lowest of standards on the capital defendant will affect *Atkins* determinations "only in a narrow class of cases where the evidence is in equipoise" or where the evidence is equally strong that the capital defendant is mentally retarded and that he is not. *Medina*, 505 U.S. at 449, 112 S.Ct. 2572. The *Atkins* Court recognized the inherent and practical difficulties of determining which offenders are in fact retarded. *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242 (describing subjective clinical factors for determining mental retardation). While we do not believe that the difficulty of the inquiry alone mandates a low probative threshold, given the presumptions favoring life built into Pennsylvania's capital sentencing scheme, we perceive no basis for allocating to the capital defendant the larger share of risk that accompanies burdens of proof more onerous than a preponderance of the evidence. Also, in this Commonwealth, this degree of proof generally comports with that of defendants on whom the burden is placed to prove their affirmative defenses. *See, e.g.*, 18 Pa.

C.S. § 315(a) (insanity defense); 18 Pa.C.S. § 313(b) (entrapment defense).[23]

In approving the placement of the burden of proof on the defendant by a preponderance of the evidence, we are in line with the great weight of authority. *See Grell, supra,* 135 P.3d at 703. "Every state that has addressed the issue [pre-dating or after *Atkins* ] has found that the defendant should bear the burden of proof on an *Atkins* claim, and all but six require the defendant to prove mental retardation by a preponderance of the evidence." *Jimenez, supra,* 908 A.2d at 188 (citing *Pruitt v. State,* 834 N.E.2d 90, 102 n. 1 (Ind.2005) (listing states that employ preponderance of evidence standard), *cert. denied,* 548 U.S. 910, 126 S.Ct. 2936, 165 L.Ed.2d 962 (2006); *Ex parte Briseno,* 135 S.W.3d at 12 n. 44 (same)). Of the states that devised procedures following *Atkins,* all but one jurisdiction, Delaware, chose preponderance of the evidence as the standard of proof. *Grell,* 135 P.3d at 703. All other statutes that impose a higher standard of proof pre-date *Atkins.* It is also worth emphasizing that, unlike legislators in other states, the elected representatives in Pennsylvania's General Assembly

23. Although the U.S. Supreme Court has not addressed the issue, some courts have questioned whether standards higher than preponderance can withstand constitutional scrutiny. *See, e.g., Hill v. Schofield,* 608 F.3d 1272 (11th Cir.2010) (striking statutory "beyond a reasonable doubt" burden of capital defendant to prove *Atkins* claim because "not constitutionally permissible to expect an offender who asserts mental retardation to bear the highest risk that our criminal justice system can impose of the erroneous conclusion that he is not mentally retarded"), *vacated and rehearing granted,* 625 F.3d 1313 (11th Cir.2010): *Pruitt v. State,* 834 N.E.2d 90, 102 (Ind.2005) (statutory "clear and convincing evidence" burden of proof unconstitutional; capital defendant must prove *Atkins* claim by preponderance of evidence) (citing *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (Oklahoma law presuming defendant is competent to stand trial unless he·proves incompetence by clear and convincing evidence violates due process)). In *Hill,* after rehearing, the Eleventh Circuit *en banc* affirmed the district court's denial of appellant's constitutional challenge to Georgia's "beyond a reasonable doubt" burden of proof without reaching the merits of the issue. *Hill v. Humphrey,* 662 F.3d 1335, 1360 (11th Cir.2011) ("[The Antiterrorism and Effective Death Penalty Act of 1996] requires us to affirm the denial of Hill's § 2254 petition. We do not decide whether Georgia's burden of proof is constitutionally permissible, but only that no decision of the [U.S.] Supreme Court clearly establishes that it is unconstitutional.").

did not exempt mentally retarded capital defendants from the death penalty by statute. Rather, the decision here implements a constitutional right newly-recognized by the U.S. Supreme Court in *Atkins*. While the General Assembly may have chosen, and may still choose, to allocate the burden of proof differently, and to affix a different level of proof, at this juncture, we are persuaded that a different allocation or standard of proof are not necessary to vindicate the constitutional right of mentally retarded capital defendants recognized in *Atkins*, or to secure Pennsylvania's "interest in prompt and orderly disposition of criminal cases." *See Cooper v. Oklahoma*, 517 U.S. 348, 360, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

### 3. Juror Unanimity

Similarly, again operating without a contrary indication of policy from our General Assembly, we believe that *Atkins* ineligibility for execution is proper only where the jury finding of mental retardation is unanimous. The U.S. Supreme Court has not spoken on the constitutionality of a state's procedural rule requiring unanimity to accept an affirmative defense but not requiring unanimity to reject the same affirmative defense. *See McKoy v. North Carolina*, 494 U.S. 433, 450 n. 4, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring) ("jury's inability to agree as to an ultimate issue [*i.e.*, an affirmative defense] typically results in a deadlock or hung jury"); *id.* at 467 & n. 4, 110 S.Ct. 1227 (Scalia, J., dissenting, joined by Rehnquist, C.J., and O'Connor, J.) (where instruction states that "[G]uilt must be established beyond a reasonable doubt before the jury can even consider an affirmative defense," if jurors follow instruction, "it would appear that the jury that has considered but not unanimously found an affirmative defense must return a verdict of guilty"). While no established constitutional rule currently binds us to a result when the jury deadlocks, as we have developed above, the High Court has also recognized that states have latitude in deciding how a jury must consider *Atkins* evidence. *See Atkins*, 536 U.S. at 317, 122 S.Ct. 2242 (states to devise implementing procedure); *cf. Saffle v. Parks*, 494 U.S. 484,

490, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (stricter constitutional limitations on state decisions regarding "what" evidence jury may consider versus "how" evidence is considered).

One element of "how" evidence is considered by the jury is the quantum of proof; another is the level of juror agreement required to exempt a capital defendant from the death penalty under *Atkins*. Both elements involve decisions on which party bears the risk of error regarding the *Atkins* decision. Regarding unanimity, of concern are cases in which it is possible that some, but not all, jurors will be persuaded by the capital defendant's evidence of mental retardation and the jury will be divided on the *Atkins* question. Assuming that jurors follow the trial court's instructions regarding this Court's *Miller* standard, such a "deadlock" should occur only in a narrow class of cases in which the evidence is close on the *Atkins* claim. The U.S. Supreme Court has indicated that assigning the risk of error to the capital defendant under these sort of circumstances is constitutionally permissible. *See Medina,* 505 U.S. at 449, 112 S.Ct. 2572; *Cooper,* 517 U.S. at 366, 116 S.Ct. 1373.

In practical terms, placing the burden to affirmatively prove an *Atkins* claim on the proponent means that if the jury unanimously finds that the capital defendant is mentally retarded, he is exempt from the death penalty, and the penalty proceeding is at an end. Any other jury decision equates to a finding in favor of the Commonwealth on the *Atkins* issue. A jury finding, much less a unanimous jury finding, that the defendant is **not** mentally retarded is unnecessary; as with all preponderance determinations, if the jury believes the evidence to be equivocal, the party with the burden cannot prevail. *Accord U.S. v. Cisneros,* 385 F.Supp.2d 567, 568 (E.D.Va.2005) (memorandum order) (same).

A different rule governing instances of jury division on the *Atkins* question would be unmoored from the above precedents, would be unwieldy (requiring juror interrogatories or polling mid-proceeding and the prospect of empanelling new *Atkins* juries), would go farther than *Atkins*

commands, and is not required, as a matter of policy, by our General Assembly. We are aware, of course, that in the context of the ultimate weighing process in the penalty phase, the U.S. Supreme Court has calibrated the risk differently. At this "selection" stage, the central interest in devising and giving effect to mitigating evidence is to avoid arbitrary decisions to impose the death penalty. *McKoy*, 494 U.S. at 440, 110 S.Ct. 1227. Thus, the Court prohibits states from limiting a sentencing jury's consideration of relevant mitigating evidence by requiring unanimity to find, as a matter of law, that a mitigating circumstance exists. *Id.* at 443, 110 S.Ct. 1227. The corollary of this rule is that a single juror may give sufficient weight to a mitigating circumstance to render it a dispositive factor at the penalty phase. *Accord Commonwealth v. Moore*, 580 Pa. 279, 860 A.2d 88, 101 n. 1 (2004) (Saylor, J., concurring). In short, at the selection phase, where unanimity is required to return a sentence of death, a single juror's view of a mitigating circumstance can result in a life sentence.

But, the *Atkins* inquiry concerns eligibility for capital punishment given an emerging national consensus against execution of the mentally retarded, not the jury's later weighing and selection process, and concomitant concerns with reducing arbitrary decisions in that weighing process. The concern with giving effect to all possible relevant mitigating circumstances is not present in the *Atkins* inquiry. The risk posed by non-unanimous *Atkins* determinations by a jury may properly be borne by the capital defendant, and certainly, the U.S. Supreme Court has not indicated to the contrary.

Moreover, under the procedure we approve here, a defendant whose *Atkins* claim is rejected by the jury still has the right to present or argue the same competent evidence in mitigation at the selection phase of the trial, in conjunction with other relevant evidence of mitigation (including other evidence bearing on his mental state and condition independent of mental retardation). The power of one juror to give ultimate effect to mitigation evidence, including evidence bearing on mental retardation which persuaded the same juror at

the *Atkins* stage, remains intact at this stage. Nothing in *Atkins* obliges the states to go farther and place the risk of a non-unanimous jury decision on the *Atkins* question upon the Commonwealth, and the General Assembly has not established such a policy.

## VIII. Atkins Jury Instructions

Finally, appellant submits a question for review regarding the trial court's *Atkins* jury instructions. In the argument section of the brief, appellant states that he "respectfully declines argument" on this issue because the court's jury instructions on mental retardation are a legal nullity. Appellant rests on the argument that because *Atkins* relief is to be decided by a judge, any jury instructions would be unacceptable and inappropriate. The Commonwealth responds that the issue is waived and refers this Court to its prior discussion of jury instructions. The trial court undertook a merits analysis of this issue and found appellant's claim meritless.

Appellant purposely abandons on appeal any argument regarding the propriety of the trial court's jury instructions. Accordingly, we conclude that this issue is not reviewable. *See, e.g., Commonwealth v. Heidnik*, 526 Pa. 458, 587 A.2d 687 (1991) (Court did not undertake review of issues appellant abandoned on appeal).

## IX. Statutory Review

Having rejected the claims for relief appellant has raised, we now turn to the independent penalty review mandated by statute, 42 Pa.C.S. § 9711(h)(3). Section 9711(h)(3) provides that "[t]he Supreme Court shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." Our review of the record reveals that the sentence of death in this case was not the product of passion, prejudice or any other arbitrary factor, but was based upon the record. In addition, the evidence presented was sufficient to support the

jury's finding of the aggravating circumstance of murder committed during the perpetration of a felony (robbery), 42 Pa.C.S. § 9711(d)(6). Accordingly, we will not disturb the sentence of death.

## Conclusion

For these reasons, appellant's judgment of sentence is affirmed.[24]

Justices SAYLOR, EAKIN, BAER, and McCAFFERY join the opinion.

Justice ORIE MELVIN files a concurring and dissenting opinion, in which Justice TODD joins.

24. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

## Other States' Approaches to Atkins Procedure[1]

| State | Factfinder | Timing | Burden of Proof | Source |
|---|---|---|---|---|
| Alabama | Judge. | As soon as possible, preferably before trial. | On defendant (preponderance) | Morrow v. State, 928 So.2d 315 (Ala Crim. App. 2004); Ala.R.Crim.P. 32. |
| Alaska[2] | n/a. | n/a. | n/a. | n/a. |
| Arizona | Judge (death penalty notice triggers expert psychiatric review). And trier of fact if evidence of mental retardation is submitted in mitigation at penalty phase. | Pre-trial. | On defendant (clear & convincing evidence). | Ariz. Rev. Stat. § 13-753 (2001). |
| Arkansas | Judge. And jury (unanimous) during penalty phase de novo, if judge denies claim. | Pre-trial. | On defendant (preponderance). | Ark. Code § 5-4-618 (1993). |
| California | Jury. Or judge pre-trial if, within a reasonable time prior to trial, defendant waives jury. | Post guilt phase, pre penalty phase. | On defendant (preponderance). | Cal. Penal Code § 1376 (2003). |
| Colorado | Judge. | Pre-trial. | On defendant (clear & convincing evidence). | Colo. Rev. Stat. § 18-1.3-1102 (2002). |
| Connecticut | Trier of fact (jury or judge, if defendant waives jury). | Penalty phase. | On defendant (preponderance) (same as w/ mitigator). | Conn. Gen. Stat. § 53a-46a (2001); State v. Rizzo, 833 A.2d 363, 376 & n.5 (Conn. 2003). |

[1] In several states, the statutory source of the procedure for adjudicating a mental retardation claim pre-dates the U.S. Supreme Court's decision in Atkins. These states exercised their legislative prerogative to deem mentally retarded capital defendants ineligible for the death penalty, and indeed, the Atkins Court cited such existing statutes in support of its finding of a "national consensus" against execution of the mentally retarded. See Atkins v. Virginia, 536 U.S. 304, 314-16 (2002). Two of these jurisdictions, Colorado and Maryland, relocated and amended the statutes referenced by the High Court in Atkins after the decision of the High Court.

[2] No death penalty. Alaska Stat. § 12.55.125 (1978).

| State | Factfinder | Timing | Burden of Proof | Source |
|---|---|---|---|---|
| Delaware | Judge. And jury during penalty phase in mitigation, if judge denies claim. | Penalty phase. | On defendant (clear & convincing evidence). | 11 Del. Code § 4209 (2002). |
| Florida | Judge. | Penalty phase. | On defendant (clear & convincing evidence) | Fla. Stat. § 921.137 (2001). |
| Georgia | Trier of fact (jury, or judge if defendant waives jury). | Guilt phase (verdict is "guilty but mentally retarded"). | On defendant (beyond a reasonable doubt). | Ga. Code § 17-7-131 (1988); But see Hill v. Schofield, 608 F.3d 1272 (11th Cir. 2010) (beyond a reasonable doubt burden unconstitutional), vacated & rehearing granted, 625 F.3d 1313 (11th Cir. 2010) (en banc). |
| Hawaii[3] | n/a. | n/a. | n/a. | n/a. |
| Idaho | Judge. | Pre-trial. | On defendant (preponderance). | Idaho Code § 19-2515A (2003). |
| Illinois[4] | n/a. | n/a. | n/a. | n/a. People v. Pulliam, 794 N.E.2d 214 (Ill. 2002) (legislature to devise Atkins procedure). |
| Indiana | Judge. | Pre-trial. | On defendant (preponderance). | Ind. Code 35-36-9-5 (1994). Ind. Code 35-36-9-4 (1994); See Pruitt v. State, 834 N.E.2d 90 (Ind 2005) (clear & convincing evidence burden of proof unconstitutional). |
| Iowa[5] | n/a. | n/a. | n/a. | n/a. |

[3] No death penalty. Haw. Rev. Stat. § 706-656 (1986).

[4] Death penalty abolished effective July 1, 2011. 725 Ill. Comp. Stat. 5/119-1 (2011). Governor Quinn has commuted all existing death sentences to life without parole and promised to do the same for any death sentences imposed until statutory abolition goes into effect.

[5] No death penalty. Iowa Code §§ 707.2, 902.1 (1976).

| State | Factfinder | Timing | Burden of Proof | Source |
|---|---|---|---|---|
| Kansas | Judge. | Post guilt phase, pre penalty phase. | On defendant (unclear). | Kan. Stat. § 21-4623 (1994), renumbered Kan. Stat. § 21-6622 (2011), eff. July 1, 2011. |
| Kentucky | Judge. | Pre-trial. | On defendant (preponderance). | Ky. Rev. Stat. § 532.135 (1990). Bowling v. Commonwealth, 163 S.W.3d 361 (Ky. 2005). |
| Louisiana | Jury. Or judge pre-trial if parties agree. | Penalty phase. | On defendant (preponderance). | La. Code Crim. Proc. art. 905.5.1 (2003). |
| Maine[6] | n/a. | n/a. | n/a. | n/a. |
| Maryland | Trier of fact (jury, or judge if waives jury). | Post guilt phase, pre penalty phase. | On defendant (preponderance) | Md. Code, Criminal Law, §§ 2-202, 2-303 (2002); Md. Rules 4-343 (2009). |
| Massachusetts[7] | n/a. | n/a. | n/a. | n/a. |
| Michigan[8] | n/a | n/a. | n/a. | n/a. |
| Minnesota[9] | n/a. | n/a | n/a. | n/a. |
| Mississippi | Judge. | Pre-trial. URCCC 8.02. | On defendant (preponderance) | Chase v. State, 873 So.2d 1013 (Miss. 2004). |
| Missouri | Trier of fact (jury, or judge if defendant waives jury). Or judge pre-trial if parties agree in writing and with leave of court (does not waive right to re-submit to trier of fact). | Penalty phase. | On defendant (preponderance). | Mo. Stat. § 565.030 (2001). |

---

[6] No death penalty. 17-A Me. Rev. Stat. § 1251 (1976).

[7] No death penalty since 1984. Commonwealth v. Colon-Cruz, 470 N.E.2d 116 (Mass. 1984) (1982 death penalty statute burdened right to trial and right not to plead guilty, and thus held unconstitutional). No Atkins procedure devised

[8] No death penalty. Mich. Comp. Laws § 750.316 (1980).

[9] No death penalty. Minn. Stat. § 609.185 (1963).

| State | Factfinder | Timing | Burden of Proof | Source |
|---|---|---|---|---|
| Montana[10] | n/a. | n/a. | n/a. | n/a |
| Nebraska | Judge. | Post penalty phase but pre-sentence. | On defendant (preponderance). | Neb. Rev. Stat. § 28-105.01 (1998). |
| Nevada | Judge. | Pre-trial. | On defendant (preponderance). | Nev. Rev. Stat. 174.098 (2003) |
| New Jersey[11] | Jury (either to negate element of crime or in mitigation at penalty phase). Or judge pre-trial if "reasonable minds cannot differ as to the existence of retardation." | Post guilt phase, pre penalty phase. | On defendant (preponderance). | State v. Jimenez, 908 A.2d 181 (N.J. 2006) (establish guidelines but refer to procedural rules committee). |
| New Hampshire[12] | n/a. | n/a. | n/a. | n/a. |
| New Mexico[13] | Judge. Or trier of fact at penalty phase (conclusive mitigator decided before considering other aggravators & mitigators) | Any time. Pre-trial motion must be decided pre-trial. | On defendant (preponderance). | State v. Flores, 93 P.3d 1264 (N.M. 2004), interpreting N.M. Stat. § 31-20A-2.1 (1991), repealed. |
| New York[14] | Judge. Or judge pre-trial if court has "reasonable cause" to believe defendant is mentally retarded. | Post penalty phase if court sentence is death. | On defendant (preponderance). | N.Y. Crim. Proc. Law § 400.27 (1995). |

10 No Atkins procedure devised.

11 Death penalty was abolished by statute effective December 17, 2007. N.J. Stat. § 2C:11-3 (2007). Persons sentenced to death prior to December 17, 2007, are resentenced to life imprisonment without possibility of parole on motion to the sentencing court and waiver of any further appeals related to sentencing. N.J. Stat. § 2C:11-3b (2007).

12 No Atkins procedure devised.

13 Death penalty was abolished by statute effective July 1, 2009. N.M Law 2009, Ch. 11, § 5. New statute applies to crimes committed on or after July 1, 2009. N.M. Law 2009, Ch. 11, § 6.

14 No death penalty since 2004. People v. LaValle, 817 N.E.2d 341 (N.Y. 2004) (mandatory jury instruction on death penalty deemed unconstitutional).

| State | Factfinder | Timing | Burden of Proof | Source |
|---|---|---|---|---|
| North Carolina | Jury. Or judge pre-trial at court's discretion, or if prosecution consents (does not waive right to submit to jury). | Post guilt phase, pre penalty phase. | On defendant (clear & convincing evidence pre-trial, or preponderance at penalty phase). | N.C. Gen. Stat. § 15A-2005 (2001). |
| North Dakota[15] | n/a. | n/a. | n/a. | n/a. |
| Ohio | Judge. | Pre-trial; but, may also be raised during trial. | On defendant (preponderance). | State v. Lott, 779 N.E.2d 1011 (Ohio 2002). |
| Oklahoma | Judge. And jury pre-penalty phase if judge denies claim (not death penalty eligible if unanimous jury decision, otherwise simple mitigator). | Pre-trial. | On defendant (clear & convincing evidence pre-trial, or preponderance at penalty phase). | 21 Okla. Stat. § 701.10b (2006). |
| Oregon[16] | n/a. | n/a. | n/a. | n/a. |
| Rhode Island[17] | n/a. | n/a. | n/a. | n/a. |
| South Carolina | Judge. And jury at penalty phase in mitigation, if judge denies claim. | Pre-trial. | On defendant (preponderance). | Franklin v. Maynard, 588 S.E.2d 604 (S.C. 2003); S.C. Code § 16-3-20 (1992) (mitigation). |
| South Dakota | Judge. And jury during penalty phase in mitigation, if judge denies claim. | Pre-trial. | On defendant (preponderance). | S.D. Codified Laws § 23A-27A-26.3 (2000). |
| Tennessee | Judge. And jury during penalty phase in mitigation, if judge denies claim. | Pre-trial. | On defendant (preponderance). | Tenn. Code § 39-13-203 (1990). |

[15] No death penalty. N.D. Cent. Code §§ 12.1-16-01, 12.1-32-01 (1973).

[16] No Atkins procedure devised.

[17] Death penalty was abolished by statute effective May 9, 1984. R.I. Gen. Laws § 11-23-2 (1984).

| State | Factfinder | Timing | Burden of Proof | Source |
|---|---|---|---|---|
| Texas | Trier of fact (jury or judge) (accepted; required procedure not yet established). | Penalty phase. (accepted; required procedure not yet established). | On defendant (preponderance). | Gallo v. State, 239 S.W.3d 757 (Tex. Crim. App. 2007); Williams v. State, 270 S.W.3d 112 (Tex. Crim. App. 2008). |
| Utah | Judge. And jury during penalty phase in mitigation, if judge denies claim. | Pre-trial. | On defendant (preponderance). | Utah Code § 77-15a-104 (2003). |
| Vermont[18] | n/a. | n/a. | n/a. | n/a. |
| Virginia | Trier of fact (jury or judge, if no jury). | Penalty phase. | On defendant (preponderance). | Va. Code § 19.2-264.3:1.1 (2003). |
| Washington | Judge. | Penalty phase. | On defendant (preponderance). | Wash. Rev. Code § 10.95.030 (1993). |
| West Virginia[19] | n/a. | n/a. | n/a. | n/a. |
| Wisconsin[20] | n/a. | n/a. | n/a. | n/a. |
| Wyoming[21] | n/a. | n/a. | n/a. | n/a. |

[18] No death penalty. Vt. Stat. tit. 13, § 2303 (1965). But see Vt. Stat. tit. 13, § 3401 (death penalty for treason). No Atkins procedure devised.

[19] No death penalty. W. Va. Code §§ 61-2-2, 61-11-2 (1965).

[20] No death penalty. Wis. Stat. §§ 940.01, 939.50(3)(a) (1977).

[21] No Atkins procedure devised. But see Wyo. Stat. § 7-11-302 (punishment of person with "mental deficiency"); § 7-11-301 (mental deficiency means defect attributable to intellectual disability, brain damage, and cognitive disabilities).

Justice ORIE MELVIN, concurring and dissenting.

I commend the Majority for its exhaustive treatment of the claims raised by Appellant, and I join the Majority's disposition of Appellant's substantive claims. I cannot, however, join the Majority's articulation of the procedure for implementing the High Court's *Atkins* decision.[1] Specifically, I believe that

1. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

the Majority's decisions to omit any notice requirements will exacerbate the problem that it attempts to remedy: "the prospect of different standards and manners of implementation" of *Atkins*. Majority Opinion at 64, 36 A.3d at 62. Moreover, I disagree with the Majority's determinations concerning the identity of the fact-finder and the timing of the adjudication.[2] Accordingly, I respectfully dissent in these regards.

In *Atkins*, the United States Supreme Court held that the Federal Constitution " 'places a substantive restriction on the State[s'] power to take the life' of a mentally retarded offender," *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)), but left to the states the task of developing the appropriate procedures for enforcing this substantive restriction, *id.* at 317, 122 S.Ct. 2242 ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." (second and third alterations in original) (citation omitted)). Recognizing that it has been nine years since the Court decided *Atkins*—and that the legislature has not acted to address the procedural void left in its wake— the Majority undertakes the unenviable task of setting forth a scheme for disposing of a capital defendant's claim of mental retardation in the trial setting.[3] *See* Majority Opinion at 47–50, 36 A.3d at 52–53. Specifically, it adopts the following paradigm: (1) a colorable *Atkins* issue should be submitted to the jury for a penalty phase decision, *id.* at 61–64, 36 A.3d at 61–62; (2) the parties may agree to waive a jury determination and ask the court to decide the *Atkins* claim at any stage of the trial, *id.* at 65–66, 36 A.3d at 63; and (3) if the parties opt for the latter option, the court's determination is conclu-

**2.** As explained *infra,* my disagreement with the Majority on these points does not affect my view that Appellant's judgment of sentence should be affirmed.

**3.** As the Majority notes, this Court has already addressed the standard for assessing mental retardation under *Atkins, see Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624 (2005), as well as the procedural standard for addressing *Atkins* claims in a post-conviction setting, *see Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128 (2009). *See* Majority Opinion at 61–64, 36 A.3d at 61–62.

sive, and the *Atkins* claim cannot be renewed before the jury, *id.* While I appreciate the Majority's effort to articulate a workable solution to resolve *Atkins*-related issues, I do not believe this framework is the most pragmatic approach for addressing the problem.

To begin, I perceive several major procedural drawbacks stemming from the Majority's silence concerning when a capital defendant must provide notice of his intent to raise an *Atkins* claim. *See generally* James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 27 Mental & Physical Disability L. Rep. 11, 14–15 (Jan.-Feb.2003) (outlining notice considerations for *Atkins* claims). Indeed, although the Majority does state that "[i]n cases of requested jury waiver, an agreement must be presented to the court for approval in sufficient advance as not to delay or disrupt the trial proceedings," Majority Opinion at 67, 36 A.3d at 64, it does not provide a directive on when a defendant must notify the court or counsel for the Commonwealth that it is raising the claim in the first place. Such an omission, in my view, creates serious problems for litigating *Atkins* claims before the trial court.

As an initial matter, a trial court presented with an *Atkins* claim must determine whether the defendant raised the issue in a timely manner. Because the Majority offers no direction as to how this determination should be made, trial courts will likely adopt their own notice procedures, which could result in disparate treatment of capital defendants with respect to waiver issues. For example, a judge in Schuylkill County might say that any capital defendant intending to raise an *Atkins* claim must do so prior to the beginning of trial, while a judge in Westmoreland County might permit a capital defendant to raise an *Atkins* claim at any point prior to the beginning of the sentencing phase, and yet another judge in Erie County might permit the defendant to raise the claim at any point prior to the jury charge at sentencing. Although it is uncertain whether this Court would uphold convictions based on such varying procedures—and I do not presume to decide the matter here—it is clear that the result would violate the principle that "all prosecutions should receive

application of uniform procedures." *Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119, 1130 (1993). Moreover, this scheme will have the opposite effect of that intended by the Majority—namely, providing uniformity in the procedure utilized for addressing *Atkins* claims. *See* Majority Opinion at 47–48, 36 A.3d at 52 (noting that the legislature's delay in adopting *Atkins* procedures "has caused uncertainty in the lower courts, and could lead to different standards and procedures being employed in different courtrooms throughout the Commonwealth"); *id.* at 64, 36 A.3d at 62 ("[T]he prospect of different standards and manners of implementation [of *Atkins*] in capital cases within a single state is no longer tenable."). Such a situation, in my opinion, is untenable.

Additionally, assuming *arguendo* that defendants are permitted to raise *Atkins* claims after trial has commenced—indeed, there is nothing in the Majority Opinion that would prohibit this from occurring—there remain several procedural determinations that the Majority fails to resolve. First, the trial court will still have to determine whether the claim was raised in a timely fashion. While this determination presumably would turn upon diligence, i.e., when the defendant knew or should have known that a viable claim existed, there is nothing in the Majority's opinion that requires or encourages the defense to investigate the potentiality of such a claim with any sort of expediency. Thus, under the Majority's procedure, simply happening upon the claim at trial and raising it at that point would be permissible.

Presuming the claim is timely raised, the trial court then will be tasked with determining how to conduct the remainder of the trial proceedings. At this point, the Commonwealth will need some time to have its experts examine the defendant and prepare a report, and the defense will need time to review the report and put together its own evidence on the matter. By the time this process has concluded, it could be well after the parties have rested and the jury has rendered its guilt-phase verdict (assuming the court is to allow the guilt phase of trial to continue). This process raises the additional question of whether the court should keep the jury impaneled until the

parties are ready to proceed on the *Atkins* claim or whether the Court should discharge the jury and impanel a new jury when the parties are ready to proceed with the sentencing phase. Without definitive guidance on the matter, trial courts are again left with the undesirable chore of promulgating their own procedures to address the issue.

Given these concerns, I would adopt a procedure that requires capital defendants to provide notice in advance of trial and by a date certain. In my view, pretrial notice provides concrete guidance to the bench and bar and avoids constitutional infirmity that may arise if varying notice procedures are utilized amongst the trial courts. As for pinpointing the exact time within which an *Atkins* claim must be raised, it must be based upon the time fixed for rendering an *Atkins* determination. Since, as explained *infra*, I believe that the judge should make the *Atkins* decision pretrial, I would require a capital defendant to raise an *Atkins* claim at least ninety days prior to trial. In my opinion, this deadline is sufficiently "late enough in the pretrial period to permit the defense to investigate and determine whether the [defendant] may actually have mental retardation" but sufficiently in advance of the date on which the hearing must be held to permit the prosecution to investigate the defendant's claim. Ellis, *supra*, at 15; *see also* Colo.Rev.Stat. § 18–1.3–1102 ("Any defendant may file a motion with the trial court in which the defendant may allege that such defendant is a mentally retarded defendant. Such motion shall be filed at least ninety days prior to trial."); S.D. Codified Laws § 23A–27A–26.3 (requiring notice ninety days prior to trial).[4] Indeed, it does not force defense counsel into the position of raising an *Atkins* issue without first having the opportunity to fully investigate its viability, *see* Ellis, *supra*, at 15, but, at the same time, it affords the Commonwealth the opportunity to

4. *Cf.* Ky.Rev.Stat. § 532.135 (requiring defendant to file a motion thirty days before trial); Nev.Rev.Stat. § 174.098 (requiring defendant to file a notice not less than 10 days before the start of trial and providing that the court must stay the proceedings pending a pretrial judge-made determination on the issue); Utah Code § 77–15a–104 (requiring notice "not fewer than 60 days before trial" and stating that the court may stay the proceedings to address the issue).

investigate the claim without necessarily causing a substantial delay in the proceedings.

As I believe in setting forth a bright line rule requiring an *Atkins* claim to be raised pretrial, I would, as noted, also require the trial court to dispose of the matter in a pretrial proceeding. In my opinion, this procedure is more in keeping with the nature of the determination and, under certain circumstances, could substantially reduce the expenditures of funds and time required for capital cases.

With respect to the nature of the determination, concluding that a defendant has mental retardation is strictly a death-disqualifying decision that does not require the factfinder to consider the specific circumstances under which the crime was committed. *See* Peggy M. Tobolowsky, *Atkins Aftermath: Identifying Mentally Retarded Defenders and Excluding Them From Execution,* 30 J. Legis. 77, 105 ("[A]n *Atkins* proceeding requires an assessment of whether proffered facts satisfy the legal definition of mental retardation adopted which, in turn, automatically determines a capital defendant's eligibility for the death penalty ... without regard to any individualized assessment of the defendant's culpability for the underlying crime."); *id.* ("Unlike the role that evidence of mental retardation plays as a mitigating factor balanced against aggravating factors in a capital sentencing determination of the requisite individualized culpability necessary for the imposition of a death sentence, the *Atkins* mental retardation determination simply removes a defendant from the determination...."); *id.* at 105–06 ("[M]ental retardation is not a sentencing issue—it is an **eligibility** for sentencing issue." (emphasis in original)). In this sense, determining whether a defendant has mental retardation is akin to determining whether a defendant is competent to stand trial. Indeed, the competency determination is divorced from the circumstances surrounding the underlying crime and instead looks only at the defendant's mental state at the time of the relevant proceeding. *See Commonwealth v. Appel,* 547 Pa. 171, 689 A.2d 891 (1997) (noting that competency to stand trial pertains to the time of trial or other legal proceeding, not the time of

the commission of the offense). Since competency determinations rest within the sound discretion of the trial court, *see Commonwealth v. Banks*, 29 A.3d 1129, 1135 (Pa.2011); 50 P.S. § 7402(d), I discern no reason why the court should not also decide the issue of mental retardation prior to trial.[5]

Additionally, placing the decision in the hands of the trial judge for a pretrial determination is economical in terms of the time and cost that might be saved by avoiding a capital trial. Indeed, it is no secret that capital cases are more time-consuming and expensive than non-capital cases. *See* Richard C. Dieter, Executive Director, Death Penalty Information Center, Testimony Before the Pennsylvania Senate Government Management and Cost Study Commission (June 7, 2010). "Jury selection takes much longer; more mental health and forensic experts will be needed; two trials will be required—one for guilt and one for sentencing; and the appeals will be far more complex, focusing on both the conviction and the death sentence." *Id.; see also Commonwealth v. Spotz*, 18 A.3d 244, 331 (Castille, C.J., concurring) (noting that capital PCRA appeals are time-consuming and complex). Additionally, "two attorneys are usually appointed for the defense, so that issues of guilt and sentencing can be separately explored." Dieter, *supra.*

In light of this time and cost consuming process, "every effort must be made to avoid a death-penalty trial, as early in the proceedings as possible, where capital punishment is precluded as a matter of law," *State v. Flores*, 135 N.M. 759, 93 P.3d 1264, 1269 (2004); *see Atkins*, 536 U.S. at 320, 122 S.Ct. 2242 (categorically prohibiting the execution of mentally retarded offenders). By placing the mental retardation determination in the hands of the judge for a pretrial decision,

5. It has been suggested that an *Atkins* determination is similar to an insanity defense, which in Pennsylvania is a jury question. *See* Majority Opinion at 52–54, 36 A.3d at 55–56. In some ways this is true; however, the insanity defense, unlike an *Atkins* determination, "focuses upon a defendant's capacity[ ] at the time of the offense," *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 788 (2004), and serves to negate an element of the crime charged, *see Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181, 1204 (1996). Thus, factors weighing in favor of a jury determination on insanity are not present with respect to an *Atkins* claim.

"significant resources [could be] saved in terms of trial preparation, motion practice, voir dire, trial time, mitigation research, etc.," if the defendant is found to have mental retardation. *United States v. Nelson,* 419 F.Supp.2d 891, 893 (E.D.La.2006): *see also Morrow v. State,* 928 So.2d 315, 324 (Ala.Crim.App.2004) (stating that pretrial *Atkins* determination by the court spares the parties from "the onerous burden of a futile bifurcated capital sentencing procedure") (quoting *State v. Williams,* 831 So.2d 835, 860 (La.2002), *superseded by statute as stated in State v. Turner,* 936 So.2d 89 (La.2006)); Ellis, *supra,* at 14 ("[I]f the defendant has mental retardation, and therefore is ineligible for the death penalty, pretrial resolution of the issue saves the State the cost of an unnecessary capital trial."); *id.* at 15 ("Presenting the arguments on this issue to a judge is likely to result in a hearing that is less elaborate and less costly that doing so before a jury."); Lt. Jessica Hudson et al., *Lightning But No Thunder: The Need for Clarity in Military Courts Regarding the Definition of Mental Retardation in Capital Cases and for Procedures in Implementing Atkins v. Virginia,* 55 Naval L.Rev. 359 (2008) (noting the economic benefits of having a judge resolve *Atkins* claims pretrial). Therefore, I see the potential for conserving resources as an added benefit to placing the *Atkins* determination with the judge prior to trial.

I recognize that implementation of any *Atkins* procedure must comport with constitutional requirements. *See Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128, 141 (2009) (observing that procedural rules "cannot trump a Sixth Amendment right to a jury"). To that effect, the Majority expresses concern that "in the context of a preserved *Atkins* claim at the trial level . . ., it is not clear that commanding a bench decision would comport with the constitutional right to a jury." Majority Opinion at 67, 36 A.3d at 64. My review of the relevant law, however, compels my conclusion that this concern is unfounded.

With respect to federal constitutional law, in a trilogy of cases decided in recent years, the United States Supreme Court has clarified that a criminal defendant is entitled to a jury determination under the Sixth Amendment when an

increase in penalty is dependent upon the finding of a particular fact. *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury...."). In *Apprendi*, the Court held that "any fact that increases the penalty for a crime beyond the proscribed statutory maximum must be submitted to a jury." 530 U.S. at 490, 120 S.Ct. 2348. In *Ring*, the Court determined that "[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589, 122 S.Ct. 2428. Finally, in *Blakely*, the Court held that state sentencing guidelines are unconstitutional when they permit a judge to sentence a defendant outside the guidelines based upon the judge's finding of additional facts such as deliberate cruelty. 542 U.S. at 303–04, 124 S.Ct. 2531.

As applied in the *Atkins* context, I fail to see how the United States Constitution compels a jury determination on the issue of mental retardation. While findings of fact are required, those factual determinations do not increase a capital defendant's penalty. If sufficient facts support a finding of mental retardation, then a defendant convicted of first-degree murder is categorically disqualified from having his penalty increased. Conversely, if the facts do not support a finding of mental retardation, the capital defendant's penalty is not *ipso facto* increased—the jury will still have to weigh aggravating and mitigating factors before reaching a sentencing conclusion. Thus, regardless of the ultimate disposition of the *Atkins* claim, no sentencing increase occurs unless it "derives wholly from the jury's verdict." *Blakely*, 542 U.S. at 306, 124 S.Ct. 2531.

As for the Pennsylvania Constitution,[6] no case from this Court purports to require a jury to make an *Atkins* determi-

6. *See* Pa. Const. art. I, § 6 (Trial by jury shall be as heretofore, and the right thereof remain inviolate."); *id.* art. I, § 9 (stating that "in prose-

nation. Indeed, although the Constitution "requires that one accused of a 'serious offense' be given a jury trial," *Commonwealth v. Mayberry*, 459 Pa. 91, 327 A.2d 86, 89 (1974) (citing *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)), there is no authority in the jurisprudence of this Commonwealth indicating that a defendant has a right to have a jury make an *Atkins* determination.[7] In the absence of some compelling argument to the contrary, I can find no reason to prohibit the judge from making an *Atkins* decision prior to trial.

As a final matter, I want to make it clear that while I believe the better practice is to submit the *Atkins* adjudication to the judge prior to trial, I nonetheless agree with the Majority's determination that the trial court did not err in denying Appellant's request for a pretrial bench adjudication under the facts of this case in the absence of any guidance from the General Assembly or this Court. I further agree with the Majority that the burden of proof in an *Atkins* claim should be on the defendant by a preponderance of the evidence. Accordingly, while I dissent from the Majority's implementation of the *Atkins* procedure with respect to the factfinder and time of the mental retardation adjudication, I agree with the Majority's disposition of Appellant's substantive claims.

Justice TODD joins.

cutions by indictment or information" the accused has the right to a trial "by an impartial jury").

7. The Pennsylvania Constitution states that "in criminal cases the Commonwealth shall have the same right to trial by jury as does the accused." Pa. Const. art. I, § 6. In *Commonwealth v. White*, 589 Pa. 642, 910 A.2d 648, 662 (2006), a majority of this Court agreed that when a defendant waives his or her right to have a jury as fact-finder, that waiver does not constitute waiver of the Commonwealth's corresponding right under Article I, Section 6. The implication of this holding is that because the Commonwealth has the same right to have a jury serve as fact-finder as does the defendant, where the defendant has no right to a jury as fact-finder, neither does the Commonwealth. Accordingly, since the defendant does not have a constitutional right to have a jury find facts necessary to determine whether he has mental retardation, it follows that the Commonwealth can have no such right.